JAMES BURROUGH LIMITED and
Kobrand Corporation, Plaintiffs-
Appellants,

v.

SIGN OF the BEEFEATER, INC., and
Montgomery Ward & Co., Incorporated,
Defendants-Appellees.

No. 75–1992.

United States Court of Appeals,
Seventh Circuit.

Argued April 21, 1976.

Decided July 27, 1976.

As Amended Aug. 3, 1976.

Henry W. Lauterstein, New York City, W. Thomas Hofstetter, Chicago, Ill., for plaintiffs-appellants.

Robert F. Hanley, Chicago, Ill., Don K. Harness, Birmingham, Mich., for defendants-appellees.

Mark C. Curran, Chicago, Ill., for Montgomery Ward & Co.

Before FAIRCHILD, Chief Judge, MARKEY, Chief Judge,* and GRANT, Senior District Judge.**

MARKEY, Chief Judge.

This is an appeal from the ruling of the district court granting appellees' (Restaurant's)[1] motion for directed verdict under Fed.R.Civ.P. 41(b) grounded on appellants' (Distiller's)[2] failure to establish a right to relief. We reverse and remand.

### Background

Distiller is the owner of three trademark registrations for gin, each alleging first use on November 11, 1909. The registrations are for the term "BEEFEATER";[3] for the symbol of a Yeoman (English Tower of London guard);[4] and for the term and symbol in combination.[5] The latter trademark is:

During the period 1953 through 1974, Distiller's national retail sales, including those in restaurants, totaled nearly a billion dollars. From 1955 to 1974 Distiller's promotional expenditures, involving newspapers, magazines, and billboards, totaled nearly thirty-two million dollars.

Restaurant's predecessors, John F. Joliat and Robert E. LaJoie, commenced a restaurant operation in a suburb of Detroit, Michigan in 1957, adopting, with prior knowledge of Distiller's BEEFEATER mark, the notation SIGN OF THE BEEFEATER for their restaurant. As currently employed and as involved in this action, Restaurant's mark comprises the phrase SIGN OF THE BEEFEATER displayed in connection with the face of a fat hungry man. The man is shown as wearing a three-cornered hat, holding a knife and fork in his hands, and having a bib about his neck. The following is a typical outdoor sign employed by Restaurant.

---

* Chief Judge Markey of the U.S. Court of Customs and Patent Appeals, sitting by designation.

** Senior Judge Grant of the Northern District of Indiana, sitting by designation.

1. Sign of the Beefeater, Inc., a Michigan corporation, is a wholly owned subsidiary of Montgomery Ward & Co., Inc., an Illinois corporation.

2. James Burrough Limited, a British corporation is the distiller of BEEFEATER gin and owner of the registered trademarks involved. Kobrand Corporation, a New York corporation, is the exclusive importer and distributor of BEEFEATER gin in the United States.

3. Registration No. 678,608, issued May 12, 1959.

4. Registration No. 678,610, issued May 12, 1959.

5. Registration No. 308,053, issued November 21, 1933. Affidavits under §§ 8, 15 of the Lanham Act, 15 U.S.C. §§ 1058, 1065 are in the file of this registration.

In 1959 and 1960, Distiller objected to Joliat and LaJoie's use of BEEFEATER.[6] Ignoring Distiller's protests, Joliat and LaJoie opened a second restaurant in the Detroit metropolitan area in 1964, and a third in 1966. Also in 1966, Joliat and LaJoie filled an application[7] to register the notation SIGN OF THE BEEFEATER with the U.S. Patent and Trademark Office for restaurant services. Distiller opposed that application.[8]

Distiller's opposition was based on the ground that SIGN OF THE BEEFEATER so resembled its registered trademark BEEFEATER as to be likely to cause confusion, mistake or deception. The Trademark Trial and Appeal Board (TTAB) of the Pat-

6. In *James Burrough Ltd. v. LaJoie*, 59 CCPA 1109, 462 F.2d 570, 174 USPQ 329 (1972), the Court summarized Distiller's objections prior to the opposition:

On October 6, 1959, opposer sent a letter to the applicants requesting them to desist from using the term BEEFEATER for their restaurant. On the advice of their attorney, applicants ignored said letter. On October 30, 1959, opposer sent another letter to the applicants referring to the first letter and requesting a reply. Applicants did not respond. An envelope postmarked May 25, 1960, bearing the firm name of opposer's counsel and admittedly containing a letter was refused acceptance by the applicants, again on the advice of counsel. A personal call was made at applicants' restaurant by a representative of Kobrand Corporation, opposer's distributor in the United States, but the record is not clear as to the actual time or the purpose of this visit. Apparently the caller learned at that time that applicants' resaurant [sic] made no provisions for handling alcoholic beverages and that it closed at 9:00 o'clock at night. At any rate, opposer took no action with respect to applicants' use of SIGN OF THE BEEFEATER from May, 1960, until June, 1967.

7. Application Serial No. 238,751, filed February 14, 1966.

8. Opposition No. 47,771, filed August 24, 1967.

ent and Trademark Office dismissed that initial opposition, finding that Distiller was estopped from asserting likelihood of confusion because of laches and acquiescence. 15 U.S.C. § 1069.[9] Upon appeal, the Court of Customs and Patent Appeals (CCPA) reversed, pointing out that Distiller had never before had an opportunity to oppose Restaurant's application to register SIGN OF THE BEEFEATER, and remanded for consideration of the likelihood of confusion issue.[10] In 1972, the TTAB found that SIGN OF THE BEEFEATER so resembled Distiller's BEEFEATER trademark that confusion would be likely when the former was applied to restaurant services and sustained the opposition.[11] Restaurant did not appeal.

In February, 1972, Joliat and LaJoie assigned their rights in the contested mark to a corporation styled "Sign of the Beefeater, Inc." In the same year that corporation was, by mesne assignments, acquired by defendant Ward.

In 1973, Restaurant filed an application to register the mark involved in this action. Distiller's opposition[12] to that application has been suspended pending the outcome of this appeal.

Restaurant expanded its operations to the Chicago, Illinois metropolitan area in 1975.[13] Distiller filed a civil action in the U. S. District Court for the Northern District of Illinois, Eastern Division, alleging trademark infringement, unfair competition and trademark dilution. Specifically, Distiller alleged that use of the SIGN OF THE BEEFEATER sign in connection with restaurant services would be likely to cause confusion, mistake or deception, in view of Distillers long use of its BEEFEATER trademarks. Restaurant denied any likelihood of confusion, mistake or deception and affirmatively alleged laches and estoppel.

Upon completion of Distiller's case, Restaurant moved for a directed verdict under Fed.R.Civ.P. 41(b) for failure of Distiller to establish a right to relief. The District Court, indicating that it had taken detailed notes and that it considered the issues "not too complex," dispensed with oral argument from either side and retired to chambers to consider the motion. Returning to the bench, the court granted the motion, stating its findings and conclusions orally for the record. The findings and conclusions of the District Court material on this appeal are:

\* \* \* I have before me the Sign of the Beefeaters sign which has been staring at me throughout the trial and for most of yesterday I stared at the Beefeater Gin bottle with the Yeoman of the Guard and the word Beefeater and the advertising and the various manifestations of Burrough's registered marks, and a comparison of those two is very easy and obvious to make just by looking at them.

\* \* \* \* \* \*

\* \* \* The [trademark] laws are drafted and are applied and must be interpreted by the Court in an economic context so that infringement is normally for business advantage and unfair competition and the concept of confusion is a legal concept as a legal concept relates to the confusion among consumers of business entities to the economic disadvantage of one, and I think the same general economic concepts are applicable to the legal concepts of dilution.

\* \* \* \* \* \*

9. *James Burrough Ltd. v. LaJoie,* 162 USPQ 269 (TTAB 1969).

10. *James Burrough Ltd. v. LaJoie, supra,* note 6. Chief Judge Markey was not a member of the court which considered and decided the case and took no part therein.

11. *James Burrough Ltd. v. Sign of the Beefeater, Inc., Assignee of Robert LaJoie and John F. Joliat,* 176 USPQ 184 (TTAB 1972).

12. Opposition No. 55,197, filed December 26, 1973.

13. Restaurant opened seven additional restaurants in the Detroit metropolitan area between 1966 and 1974.

* * * I suppose it would be fair to say that Beefeaters and the Yeomen together hae [sic] acquired a secondary meaning in the field of distillers competing for gin sales. It has not acquired a secondary meaning, however, outside the liquor industry.

The defendants, on the other hand, have opened and are expanding a chain of restaurants under the name Sign of the Beefeater and have a distinctive sign advertising, lighted sign outside the restaurants that contains a picture of an individual who does not bear any resemblance, I find, to the traditional London Beefeater who was on the bottle of gin.

* * * * * *

That, of course, doesn't dispose of the case, but it seems to me that there is extremely remote possibilities that anyone seeing the Sign of the Beefeater outside of a restaurant would confuse it in any with the traditional mark or legend or Yeoman who appears in the Beefeater Gin advertising on bottles. The heart of the controversy, I suppose, lies in the word Beefeater itself and the relation that the public had to it.

* * * * * *

The evidence, despite the considerable testimony, boils down to essentially what I could observe. I have seen the Sign of the Beefeater, I have studied the three registered marks, I have compared them, I have compared the testimony on the survey and I'd like to comment on that.

In response to the question, and I paraphrase because I don't remember exactly, who do you believe is sponsoring this restaurant, after the picture of the sign has been shown to the interviewee, 15 per cent of all the people questioned referred to Beefeater liquor in some way in their response and another seven and a half per cent associated the sponsoring organization with liquor of some type but not specifically with the Beefeater product. This result does not demonstrate to me any more than that a small percentage of the population thinks of Beefeater Gin

when they see the word Beefeater or hear it in any context and it does not seem to me that there is a sufficient modicum of proof to demonstrate what the audit or survey was offered to demonstrate.

The question I have to decide is whether this survey rises to the dignity of evidence proving that the sign in question evoked a public response economically harmful to the plaintiff. I've already concluded that the sign of the Beefeater does not infringe upon the Burrough's registered trademark and I now conclude that despite the survey results the evidence demonstrates that the public cannot reasonably be deemed to be confused into believing that the plaintiff is a sponsor of or associated with the defendant's restaurant.

So, I find the Sign of the Beefeater sign that is the exhibit in evidence and the one used in front of all of the restaurants in substantially the same form, does not resemble the Burrough's label sufficiently to establish an infringement on that registered symbol; I find that the registered word Beefeater gives plaintiff an exclusivity in the use of that word limited in its application to alcoholic beverages; and the third registered mark, that of the Yeoman, I find that the defendant is not using a representation of the famous Yeoman or that human figure on the defendant's sign resembles in any way the Yeoman who has become associated in the public mind with Beefeater Gin. So the allegation of trademark infringement, unfair competition and dilution of the distinctive value of the plaintiff's trademark has not been sustained, the plaintiff has not made prima facie case in support of these contentions.

One, I find that trademark has not been infringed; two, that there is not a likelihood of confusion and therefore no unfair competition and that is that the Sign of the Beefeater sign does not dilute the worth or efficacy or distinctive qualities of the plaintiff's Beefeater registered trademark.

The District Court declined to reach a finding upon the issue of laches, saying:

[I] suppose the case could possibly be determined solely on the issue of laches but it need not be and therefore I will not specifically rule on that contention of the [Restaurant].

### Issue

Whether the district court erred in directing a verdict for Restaurant.

### OPINION

■ Under Fed.R.Civ.P. 41(b), a court may order involuntary dismissal upon completion of plaintiff's evidence-in-chief if it determines that plaintiff has "shown no right to relief." Hence we are required to review "upon the facts and the law," the sufficiency of Distiller's evidence. Recognizing that the district court weighed the evidence before it, treating no one factor as determinative, we are nonetheless convinced that Distiller's evidence on the entire record was such as to have required denial of Restaurant's motion.

■ There being no dispute regarding the relevant facts and no need for resolution of conflicts in testimony, the otherwise salutory third sentence of Fed.R.Civ.P. 52(a) is not applicable. *Tisch Hotels, Inc. v. Americana Inn, Inc.,* 350 F.2d 609 (CA 7, 1965); *J. B. Williams Co., Inc. v. Le Conte Cosmetics, Inc.,* 523 F.2d 187, 189 USPQ 10 (CA 9, 1975). In determining whether the marks involved were similar in contemplation of the law, this court is as capable as was the district court of determining whether Distiller's evidence, as a matter of law, was sufficient to establish a right to relief. See *Union Carbide Corp. v. Everready, Inc.,* 531 F.2d 366, 188 USPQ 623 (CA

7 1976). Though the determination of likelihood of confusion has been termed a finding of fact, *Coca Cola Co. v. Snow Crest Beverages, Inc.,* 162 F.2d 280 (CA 1 1947), that ultimate question has been held reviewable on appeal. *La Touraine Coffee Co. v. Lorraine Coffee Co., Inc.,* 157 F.2d 115 (CA 2 1946). In all events, to the extent that the ultimate finding below of no likelihood of confusion be considered a finding of fact, we consider it to have been on this record clearly erroneous.[14]

The evidentiary effect of Distiller's federal trademark registrations is set forth in section 33(a) of the Lanham Act, 15 U.S.C. § 1115(a):

Any registration issued under the Act of March 3, 1881, or the Act of February 20, 1905, or of a mark registered on the principal register provided by this Act and owned by a party to an action shall be admissible in evidence and shall be prima facie evidence of registrant's exclusive right to use the registered mark in commerce on the goods or services specified in the registration subject to any conditions or limitations stated therein, but shall not preclude an opposing party from proving any legal or equitable defense or defect which might have been asserted if such mark had not been registered.[15]

Distiller's cause of action for trademark infringement arises under the Lanham Act. Section 32(1) of that Act, 15 U.S.C. § 1114(1), defines trademark infringement in these terms:

Any person who shall, without the consent of the registrant—

(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or

---

**14.** Restaurant argues that we should consider what the district court must have meant, rather than what was said. We are limited, however, to the findings and conclusions as they appear in the transcript of the district court's oral opinion, all material portions of which have been quoted herein to facilitate understanding. Disregard of the stated findings and conclusions of a lower court, whether in affirming or

reversing its judgment, would but open a pandora's box and would render the first sentence of Fed.R.Civ.P. 52(a) a nullity.

**15.** "Exclusive right to use" means the right to *exclude* others from using the registered mark, not a positive grant of a right to use. *Holiday Inn v. Holiday Inns, Inc.,* 534 F.2d 312, 189 USPQ 630 (CCPA 1976).

advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or

(b) reproduce, counterfeit, copy or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive

shall be liable in a civil action by the registrant for the remedies hereinafter provided. Under subsection (b) hereof, the registrant shall not be entitled to recover profits or damages unless the acts have been committed with knowledge that such imitation is intended to be used to cause confusion, or to cause mistake, or to deceive.

### Basis of Decision

 As this court stated in *G. D. Searle & Co. v. Chas. Pfizer & Co.*, 265 F.2d 385 (CA 7 1959), " * * * the test under the statute, 15 U.S.C.A. § 1114(1), is likelihood of confusion." Illinois law mandates application of the same test. *Independent Nail and Packing Co. v. Stronghold Screw Prods., Inc.*, 205 F.2d 921 (CA 7 1953). In the consideration of evidence relating to trademark infringement, therefore, a court must expand the more frequent, one-on-one, contest-between-two sides, approach. A third party, the consuming public, is present and its interests are paramount. Hence infringement is found when the evidence indicates a likelihood of confusion,

deception or mistake on the part of the consuming public. Infringement does not exist, though the marks be identical and the goods very similar, when the evidence indicates no such likelihood. See *In re E. I. duPont deNemours & Co.*, 476 F.2d 1357, 177 USPQ 563 (CCPA 1973). When equitable considerations impel the continuation of otherwise confusing trademark uses, courts will fashion appropriate relief, often requiring notices designed to limit or defeat confusion of the public. *Everest & Jennings, Inc. v. E & J Manufacturing Company*, 263 F.2d 254, 120 USPQ 247 (CA 9 1958); *Jewel Tea Co., Inc. v. Kraus*, 187 F.2d 278, 88 USPQ 507 (CA 7 1951).

As has been said, "people do not confuse trademarks—trademarks confuse people." *In re West Point-Pepperrell, Inc.*, 468 F.2d 200, 175 USPQ 558 (CCPA 1972); *Columbian Steel Tank Company v. Union Tank and Supply Company*, 277 F.2d 192, 125 USPQ 406 (CCPA 1960).

The statement of findings below twice includes a finding of no trademark infringement, followed by a separate finding of no likelihood of confusion. But the concepts are inseparable.

 A "trademark" is not that which is infringed. What is infringed is the right of the public to be free of confusion and the synonymous right of a trademark owner to control his product's reputation. Thus Distiller's evidence must be evaluated on the basis of whether it disclosed a likelihood that consumers generally familiar with Distiller's marks would be likely, upon seeing only Restaurant's sign, to believe that Restaurant's enterprise was in some way related to, or connected or affiliated with, or sponsored by, Distiller. If so, a right to relief for trademark infringement has been shown.[16]

---

16. Distiller's claim for unfair competition and for trademark dilution are absorbed in a finding that trademark infringement, *i. e.*, a likelihood of confusion, deception, or mistake, exists. Trademark infringement is one form of unfair competition and the same set of facts support a suit for either. *G. LeBlanc Corporation v. H. &*

*A. Selmer, Inc.*, 310 F.2d 449, 135 USPQ 338 (CA 7 1962); *Jewel Tea Co., Inc. v. Kraus, supra,* (citing *Armstrong Paint & Varnish Works Co. v. Nu Enamel Corp.*, 305 U.S. 315, 59 S.Ct. 191, 83 L.Ed. 195 (1938)). The Illinois Anti-Dilution Act, 140 Ill.Rev.Stat. § 22 provides for injunction against use of a trademark

Each of the evidentiary elements referred to by the district court, and by the parties before us, may bear upon the ultimate question of consumer confusion. Each should therefore be considered in the decisional process leading to that determination. The effect of each such element may vary from case to case, but the courts have established particular approaches to consideration of each of those elements. Those approaches do not appear to have been employed below. ·

■ As is common in trademark infringement suits, Distiller emphasized similarities in its label and the accused sign and Restaurant emphasized dissimilarities therein. It is of course proper to consider similarities and dissimilarities between the marks in their entireties as one element in determining likelihood of confusion. But the comparison is not that involved in testing for copyright infringement. Though the marks must be compared, they must be compared in the light of what occurs in the marketplace, not in the courtroom.

■ Hence it was error below to have evaluated Distiller's evidence on the basis of judicial comparison of Distiller's label and Restaurant's sign. Side-by-side comparison is not the test. *Sterling Drug, Inc. v. Lincoln Laboratories, Inc.*, 322 F.2d 968 (CA 7 1963). The consuming public is unlikely ever to be presented with the opportunity for such comparison. As the court said in *Colburn v. Puritan Mills*, 108 F.2d 377 (CA 8 1950), " * * * We are to determine * * * the purchasing public's state of mind when confronted by somewhat similar trademarks singly presented * * *."

Restaurant's sign is designed and placed to catch the eye of passing motorists and pedestrians as they move about in the marketplace. The sign must therefore be eval-uated on the basis of its likely effect upon consumers who do *not* have Distiller's label before them, but who may have a general, vague, or even hazy, impression or recollection of Distiller's marks such as may trigger a belief that a relation exists between Distiller and the enterprise identified by the sign. *Northam Warren Corp. v. Universal Cosmetic Co.*, 18 F.2d 774 (CA 7 1927). The district court did refer to "anyone seeing the Sign of the Beefeater outside a restaurant," but held that such person would not confuse the *sign* with "the traditional mark or legend or Yeoman" who appears on the Beefeater gin labels. As above indicated, however, the test is not whether the public would confuse the *marks*, but whether the viewer of an accused mark would be likely to associate the product or service with which it is connected with the source of products or services with which an earlier mark is connected.

■ It was likewise error below to postulate a requirement that Distiller suffer "economic disadvantage" or that Restaurant's use of its sign be "economically harmful" to Distiller. Though, as the district court recognized, trademark infringement must be considered in a marketplace context, the test, likelihood of confusion of consumers, does not require that the contending parties before the court be even in competition. Interested businessmen may sue for trademark infringement in the course of protecting their pocketbook. But it is one of the geniuses of what has been called the "free enterprise" system (but which, in its proper operation, might be better described as "consumer-choice" system) that the interests of the consuming public and of the entrepreneur are to the maximum extent paralleled. Thus the public need not rely wholly on government for protection against confusion, and need not pay the taxes such reliance would entail.

likely to dilute the distinctive quality of another's mark notwithstanding an absence of confusion as to source of goods or services. A trademark likely to confuse is necessarily a trademark likely to dilute. A discussion of Distiller's claims for unfair competition and dilution is therefore unnecessary on this appeal.

Though economic harm *per se* is not required, this court has pointed out that the owner of a mark is damaged by a later use of a similar mark which places the owner's reputation beyond its control, though no loss in business is shown. *Tisch Hotels, Inc. v. Americana Inn, Inc.*, supra. Other circuits have pointed out that borrowing of the trademark owners reputation constitutes damage. *Yale Electric Corp. v. Robertson*, 26 F.2d 972 (CA 2 1928); that damage is presumed upon finding a likelihood of confusion. *Safeway Stores, Inc. v. Rudner*, 246 F.2d 826 (CA 9 1957); and that actual or possible monetary injury need not be shown. *Sweetarts v. Sunline, Inc.*, 380 F.2d 923 (CA 8 1967).

### The Fame of Distiller's Mark

Distiller's reliance on and comingling of all three of its registered marks appears to have contributed substantially to the approach taken by the district court. The court's opinion mentioned Distiller's primary mark, the term BEEFEATER, in a single sentence, "The heart of the controversy, I suppose, lies in the word Beefeater itself and the relation that the public had to it." The court did not again advert to the effect of Restaurant's incorporation of the entirety of Distiller's primary mark in the accused sign. Nor did the court refer to the uncontested, record-established facts that the public asks for Distiller's product by the term BEEFEATER and that Restaurant's restaurants are referred to by the public and by Restaurant as BEEFEATER restaurants. As we said in *Union Carbide Corp.*, supra, "The court did not err in considering the mark as a whole but failed to give sufficient weight to the predominant feature of the marks, the words 'ever ready.'"

That Distiller's mark BEEFEATER is famous and celebrated throughout the United States is uncontested. Distiller argues that because its mark is thus "strong," it is deserving of a broad scope of protection. Though Distiller cites authorities so stating, the phrase "breadth of protection" is but shorthand reference to the more fundamental, and more appropriate consideration. The trademark laws exist not to "protect" trademarks, but, as above indicated, to protect the consuming public from confusion, concomitantly protecting the trademark owner's right to a non-confused public.

Though Distiller's mark is indeed strong,[17] Distiller could not prevail if confusion were not likely. Conversely, the owner of a so-called "weak" mark will prevail if confusion be likely. What is intended by references to "strong" and "weak" marks is the effect of such marks upon the mind of the consuming public. A mark that is strong because of its fame or its uniqueness, is more likely to be remembered and more likely to be associated in the public mind with a greater breadth of products or services, than is a mark that is weak because relatively unknown or very like similar marks or very like the name of the product.

Hence the fame of Distiller's mark BEEFEATER precludes limitation of its effect in the marketplace to merely a trademark for gin and renders erroneous the district court's finding "that the registered word Beefeater gives plaintiff an exclusivity in the use of that word limited in its

---

17. Distiller's mark has been repeatedly recognized as strong, by commentators and by the courts, the latter enjoining the use of BEEF-EATER in relation to restaurants, including restaurants that sold no liquor. See: McCarthy, *Trademarks and Unfair Competition*, § 24:6 p. 137; 3 Callman, *Unfair Competition, Trademarks and Monopolies*, (1969 ed.), § 84.-2(a) pp. 976–977; *James Burrough Ltd. v. Beef/Eater Restaurants, Inc.*, 272 F.Supp. 489 (N.D.Ga.1967), aff'd, 398 F.2d 637 (5th Cir. 1968); *James Burrough Ltd. v. Lesher*, 309 F.Supp. 1154 (S.D.Ind.1969), and *James Burrough Ltd. v. Ferrara*, 8 Misc.2d 819, 169 N.Y. S.2d 93, 115 U.S.P.Q. 290 (Sup.Ct. N.Y.Co. 1957).

application to alcoholic beverages."[18] In recognition of the fame of Distiller's mark, the court found a likelihood of confusion in its use on a restaurant that did not sell alcoholic beverages in *James Burrough Ltd. v. Beef/Eater Restaurants, Inc.*, 398 F.2d 637 (CA 5 1968), stating at 639:

> It is true that appellant operates a restaurant and appellees on the other hand make and vend gin. Both are consumable and it is repeatedly held that the parties need not be in competition and that the goods or services need not be identical.[19]

The fame of Distiller's mark BEEFEATER creates the opportunity for others to ride on the goodwill of Distiller in the effort to attract consumers to goods and services which may be thought by consumers to be in some way associated with Distiller.[20] That fame creates the "commercial magnetism" referred to by the Supreme Court in *Mishewaka Mfg. Co. v. Kresge Co.*, 316 U.S. 203, 62 S.Ct. 1022, 86 L.Ed. 1381 (1942):

> The protection of trade-marks is the law's recognition of the psychological function of symbols. If it is true that we live by symbols, it is no less true that we purchase goods by them. A trade-mark is a merchandising short-cut which induces a purchaser to select what he wants, or

what he has been led to believe he wants. The owner of a mark exploits this human propensity by making every effort to impregnate the atmosphere of the market with the drawing power of a congenial symbol. Whatever the means employed, the aim is the same—to convey through the mark, in the minds of potential customers, the desirability of the commodity upon which it appears. Once this is attained, the trade-mark owner has something of value. If another poaches upon the commercial magnetism of the symbol he has created, the owner can obtain legal redress.

The effect of Restaurant's use of BEEFEATER and of the commercial magnetism of that term was evidenced below by Distiller's survey.

## The Survey

Distiller's survey comprised a face-to-face interview of 500 heads-of-household alternatively interviewed according to sex. The survey was conducted within a five mile radius of a proposed SIGN OF THE BEEFEATER restaurant in the Chicago, Illinois metropolitan area during August, 1975. The respondents were selected by a complex probability sampling procedure. Each respondent was initially confronted with this announcement:

---

**18.** The Lanham Act specifically avoided use of prior statutory provisions and court decisions limiting the rights of trademark owners to use on their own goods and to "goods of the same descriptive properties."

Restaurant's arguments devoted to the fact that "Beefeater" is a dictionary term, and merely describes one who eats beef, are ineffective where, as here, the mark is clearly arbitrary and distinctive as applied to Distiller's goods and has achieved the fame established in the record before us. See *Tisch Hotels, supra.*

**19.** The copying of Distiller's marks in *Beef/Eater Restaurants* was flagrant. Recognition by the court of the legal principle respecting the

absence of competition between restaurant services and gin was not, however, controlled by that fact. Nor was the Patent and Trademark Office finding of confusion between SIGN OF THE BEEFEATER and BEEFEATER in *James Burrough, Ltd., supra,* n. 11.

**20.** Restaurant's attack on Distiller's BEEFEATER mark, centered on its nature (dictionary term), its use-with-the Yeoman figure on the label, and a "secondary meaning" limited to alcoholic beverages, must fail. Apart from inherent weaknesses in the attack itself, it must founder when it meets a likelihood that consumers may be confused.

Subsequently, an experienced female interviewer, who had not been made aware of the purpose of the survey, asked, inter alia, the following questions:

2a. Who do you believe is sponsoring or promoting this restaurant?

2b. What, if anything, does (INSERT NAME GIVEN IN ANSWER TO QUESTION 2a) do in addition to sponsoring or promoting resturants? (Asked unless the respondent said "Don't know" in answer to Q.2a.)

3. What other products or services, if any, do you believe are sold by the business that is sponsoring or promoting this restaurant?

The recorded verbatim responses to those questions were verified by reinterviewing 70.6% of those interviewed. Eight interviews were eliminated from the survey, and the responses were tabulated using 492 interviews.

The tabulation showed that 74 respondents (15%) responded with "Beefeater gin" (61 respondents) or "Beefeater" and another liquor-related product or service (13 respondents). An additional 37 respondents (7½%) did not say "Beefeater" but did mention gin or other liquor-related product or service.[21]

The record, as it now stands, establishes the consumer survey herein to have been fairly and scientifically conducted by qualified experts and impartial interviewers. The respondents within the five mile radius of the announcement appear to have represented a relevant portion of the consuming public. The questions, upon which the results are based, do not appear slanted or leading. The verbatim recording of the responses would appear to have negated a biased interpretation in recordation. The district court expressed no criticism of or findings on the validity of the survey itself.[22] On the present record, therefore, the survey qualifies as a reliable reproduction of prospective consumer reaction. Its results may therefore be extrapolated to encompass the consuming public and utilized in determining likelihood of confusion, deception or mistake.

After finding that 15% of the survey respondents referred to Beefeater liquor and another 7.5% referred to liquor of some type, when shown the accused sign and asked who the restaurant sponsor was, the district court found that the survey demon-

21. The reference to gin or other liquor by 111 respondents (22.5%) tends to undermine, if not refute, appellee's argument that the presence of the "No Liquor" notation in its sign would be effective to preclude any likelihood of confusion, deception or mistake.

22. Restaurant devotes a substantial portion of its brief to an attack on the validity of the survey. We will not, however, consider that question de novo. Restaurant will presumably have full opportunity to present the points here argued during its case in chief upon remand.

strated nothing more than that a "small percentage" of the population "thinks of" Beefeater Gin when "they see the word Beefeater or hear it in any context" and that that was an insufficient modicum of proof. We agree with the district court that some part of the public would think of Beefeater Gin whenever it saw or heard the term BEEFEATER. A survey was not required to establish the likelihood of that occurrence. The fame of Distiller's mark, achieved by long and widespread advertising, would inherently produce such "brand recognition."

Our difficulty, however, with the district court's conclusion respecting the survey herein is fourfold. We cannot agree that 15% is "small." Though the percentage of likely confusion required may vary from case to case, we cannot consider 15%, in the context of this case, involving the entire restaurant-going community, to be de minimus.[23] Secondly, we note that the survey respondents did not just "see" the term Beefeater. They did not "hear" that term at all before responding to the key question 2a. On the contrary, the respondents were simply shown the announcement, which incorporated the accused sign in its entirety. Thirdly, the respondents did not think of Beefeater Gin in "any" context, but in a specific, limited and probative context, i. e., "Who do you believe is sponsoring or promoting this restaurant?" Lastly, the district court's evaluation of the survey on whether it proved that the accused sign—evoked a public response economically harmful to the plaintiff—was, as above indicated, clearly in error. The sole question was whether the survey evidenced

confusion, damage being thereupon presumed.

In the absence of contrary evidence, therefore, it must be presumed that at least 15% of the restaurant-going public, upon seeing the accused sign, would mistakenly believe that Distiller is "sponsoring or promoting" the restaurant identified by that sign. That mistaken belief evidences a likelihood of confusion, deception, or mistake regarding the sponsorship of Restaurant's services sufficient on this record to establish Distiller's right to relief.[24]

### Conclusion

The judgment of the district court is reversed and the cause is remanded for further proceedings not inconsistent with the foregoing opinion.

---

**23.** The survey in *James Burrough v. Lesher, supra,* n.16, showed 11% of the respondents referring to Beefeater gin and alcoholic drinks. In *John Walker & Sons, Ltd. v. Bethea,* 305 F.Supp. 1302 (D.C.S.C.1969), a "substantial number" of survey respondents shown a sign containing the words, "Johnny Walker Motel" made an association with plaintiff's whiskey and confusion was found. In *Union Carbide Corp., supra,* this court pointed out that survey results showing confusion levels of 11.4% to 25% have been considered significant.

**24.** The survey evidence also tends to refute Restaurant's argument concerning third party uses and registrations. In any event, whether others may have used or infringed a trademark is irrelevant to the question of likelihood of confusion under the facts of this case. *Tisch Hotels, Inc. v. Americana Inn, Inc., supra.* As we said in *G. LeBlanc Corporation v. H. & A. Selmer, Inc., supra,* we are not aided by citation of other registrations, the evidence frequently being so varied on the question of likelihood of confusion.