DAVID TARIN, Indiv. and on behalf of Back-of-The-Yards Cool Heat, Inc., Plaintiff-Appellant, v. KENNETH PELLONARI *et al.*, Defendants-Appellees.

First District (5th Division)   No. 1—91—2932

Opinion filed August 20, 1993.

544

Siegan, Barbakoff & Gomberg, of Chicago (Kenneth B. Drost and Diane C. Fischer, of counsel), for appellant.

Robert K. Feldman, P.C. (Robert K. Feldman, of counsel), and Cassiday, Schade & Gloor (Timothy J. Ashe and Lynn D. Dowd, of counsel), both of Chicago, for appellees.

JUSTICE COUSINS delivered the opinion of the court:

Plaintiff David Tarin (Tarin) appeals from a final judgment entered against him by the circuit court pursuant to Supreme Court Rule 301 (134 Ill. 2d R. 301). Tarin and defendants Kenneth Pellonari (Pellonari) and Jose Diaz (Diaz) are directors and shareholders of a radiator business known as Back-of-the-Yards Cool Heat, Inc. (BOYCH). This controversy arose when defendants created a new radiator business, Cool Rite Corporation (Cool Rite) which Tarin contends is in competition with BOYCH. On May 4, 1990, Tarin, individually and on behalf of BOYCH, filed a five-count complaint against Pellonari, Diaz and Cool Rite seeking the following relief: the imposition of a constructive trust for the benefit of BOYCH and Tarin upon misappropriated corporate opportunities and assets in counts I and II; an injunction and damages for the misappropriation of the "Cool Heat" trademark in count III; removal of Pellonari and Diaz from their positions as directors of BOYCH pursuant to section 8.35 of the Business Corporation Act of 1983 (Ill. Rev. Stat. 1989, ch. 32, par. 8.35) in count IV; and an accounting in count V. Following a bench trial, the court concluded that counts I and II and the portion of count V relating thereto were barred by *laches*, and granted judgment for the defendants on the remaining counts.

We affirm.

BACKGROUND

INTRODUCTION

In 1978, Tarin and Larry Stein (Larry) became co-owners of a corporation known as Cool Heat, Inc., which operates a facility at 2859 West Montrose, Chicago, Illinois (Montrose); its primary business is the repair of auto radiators and air conditioning systems. Defendants Diaz and Pellonari were employees at Montrose. Between 1982 and 1985, Tarin and Larry expanded their business by opening additional stores. The first new store was established at 9818 Grand Avenue, Franklin Park, Illinois, and is known as Franklin Park Cool Heat, Inc. The next was BOYCH, which was established at 4701 South Damen, Chicago, Illinois. BOYCH and the other Cool Heat stores have used a distinctive logo to advertise continuously since 1978.

BOYCH was established in approximately November of 1982. Tarin, Larry, Pellonari and Diaz each owned 25% of the stock of BOYCH. Larry died in April 1986 and his son, Nick Stein (Nick), succeeded to his interests in BOYCH. Subsequently, in approximately

March 1989, Nick's interest was conveyed to Tarin, and at the time of trial, the ownership interest in BOYCH was as follows: Tarin 50%; Diaz and Pellonari 25% each. At all times, Pellonari and Diaz have been officers and directors of BOYCH. Since its inception, Pellonari and Diaz have controlled the day-to-day operations of BOYCH and managed the business. Tarin has never had any direct involvement in the operation of BOYCH.

### THE FORMATION OF COOL RITE

By 1984 or 1985, the facility at 4701 South Damen was not adequate to handle all the business BOYCH was generating. Tarin, Diaz and Pellonari frequently discussed the possibility of expanding the operations at BOYCH or, alternatively, purchasing additional property elsewhere and establishing a new radiator store. In late 1987, Pellonari and Diaz began looking at prospective property sites at which to establish a new radiator business. On February 27, 1988, Tarin, Pellonari, Diaz and Diaz's brother Raphael Diaz entered into a contract to acquire premises located at 8100 South Kedzie, Chicago, Illinois. The proposed acquisition did not materialize, however, because the parties were unable to obtain financing.

Pellonari and Diaz continued to search for a new property site. They stated that Tarin consistently expressed interest in locating a new property site and establishing a radiator business with them. Near the end of 1988, Pellonari and Diaz located a suitable property at 11701 South Pulaski, Alsip, Illinois, and invited Tarin to inspect the property. Shortly thereafter, in approximately November of 1988, Pellonari, Diaz and Tarin visited the property site. According to Diaz, Tarin said that the property was excellent and the three parties agreed to proceed with the venture together.

Diaz and Pellonari testified that the three individuals subsequently had several conversations concerning the business plan for the new radiator shop. Pellonari explained that it was Tarin's idea to name the new business Cool Rite. Diaz testified that they discussed advertising with Tarin and he agreed at that time that business cards should be ordered with the name and address of both BOYCH and Cool Rite on the same card. Finally, Pellonari stated that he discussed ordering equipment and supplies for Cool Rite through BOYCH with Tarin, and Tarin agreed to the arrangement.

In contrast, Tarin testified that he was not aware that defendants were still looking for a property site until they called him and invited him to see the Pulaski property. Tarin denied agreeing to order joint business cards or allow Cool Rite to order its equipment and supplies

through BOYCH. He stated that he told defendants that the property was too expensive, but they informed him that they had already signed the contract and would send him a copy in the mail.

A real estate contract dated December 5, 1988, was drafted naming "Pellonari, Diaz or Nominee" as purchasers. According to defendants, the word "nominee" was inserted because Tarin could not be located when the contract needed to be signed. They testified that Tarin never told them that he did not wish to be involved in the deal prior to December 5.

Both plaintiff and defendants testified that Tarin backed out of the deal two weeks prior to closing. Pellonari and Diaz contemplated that six individuals would participate in the venture and they told Tarin that all persons involved should have an equal one-sixth interest in the business. Tarin demanded that a 25% interest be allocated to himself and a 25% interest allocated to Marty Poretta, his partner at another Cool Heat store. When defendants refused to accede to his demands, he told them to forget the deal and that he refused to participate.

Tarin admitted that at the time he backed out of the Pulaski venture, in mid January 1989, he was aware that defendants were planning to go ahead with the plans to open the new radiator shop. He testified that he warned defendants that they would not be able to operate two radiator stores, and defendants assured him that they knew what they were doing. Pellonari and Diaz acquired the Pulaski property during the last week of January 1989, and Cool Rite was formed in February of 1989.

CONFLICTS ARISE

Cool Rite opened for business in February or March of 1989, and Diaz recruited Mark Esquivel to run the store. Esquivel testified that Diaz and Pellonari gave him business cards that contained both "Cool Heat" and "Cool Rite" logos and instructed him to tell customers that Cool Rite was "some kind of subdivision of Cool Heat." He testified that they also instructed him to distribute advertisements for Cool Rite while wearing a jacket which said "Cool Heat." Esquivel worked at Cool Rite until approximately April 1990, and he testified that up until the time he left, he was still giving those business cards to customers.

Tarin testified that he noticed the business cards on the premises at BOYCH in May of 1989. He stated that he complained about the use of these cards to Pellonari at this time and Pellonari assured him that it "would never happen again." Tarin testified that when he

went back to the BOYCH store on October 2, 1989, the cards were still in use.

In contrast, Pellonari testified that the first and only time Tarin objected to the use of the business cards occurred in late 1989. Pellonari and Diaz testified that when Tarin objected to the use of the business cards, Pellonari immediately threw the cards out.

Pellonari and Diaz obtained merchandise for Cool Rite by ordering through BOYCH. Pellonari would place an order which included supplies destined for Cool Rite with a BOYCH supplier. The order would be shipped and billed to BOYCH. After shipment, the Cool Rite supplies would be transported to Cool Rite, and Cool Rite would pay the supplier directly for that portion of the order. There was some evidence that this arrangement could enable Cool Rite to take advantage of volume discounts not otherwise available. Cool Rite also purchased inventory directly from BOYCH at cost.

Tarin admitted that he became aware of the ordering arrangement for supplies in February or March of 1989 when a supplier called to inquire about an overdue invoice which included merchandise destined for Cool Rite. He testified that he did not voice any objection to the supplier about the arrangement; in fact, he approved the order. Tarin testified that shortly after he spoke with the supplier, he had a meeting with Pellonari and Diaz at which time he objected to the ordering arrangement.

In direct contradiction, Pellonari and Diaz testified that Tarin never objected to the ordering arrangement prior to the filing of his lawsuit. Pellonari testified that, in any event, they discontinued this practice in April of 1990.

Esquivel, who was in charge of bookkeeping for Cool Rite, testified that Cool Rite did not pay for all of the merchandise supplied to it. However, on cross-examination, Esquivel admitted that, in fact, he does not know whether parts taken from Cool Heat to Cool Rite have actually been paid for because he had not seen the books since April 1990 when he ceased to be employed by Cool Rite. Moreover, Tarin admitted that he did not know whether Cool Rite has in fact paid for all the merchandise received from Cool Heat and that there is no way to determine whether a particular invoice has been paid.

In January 1986, the board of directors of BOYCH had adopted a resolution which required that changes in compensation for officers be approved by unanimous consent of all board members. However, in January 1989 and 1990, Diaz and Pellonari increased the salaries which they received from BOYCH without obtaining the approval of all of the directors. Diaz also admitted that in 1989, he raised the

amount of rent he was charging BOYCH to lease space in his garage without seeking approval of all the members of the board of directors at a formal meeting. However, he claims that Tarin was aware of and approved the increase.

A meeting of the board of directors took place in August of 1989 and the following individuals were present: Pellonari, Diaz, Tarin, Nick Stein and R. Burke Kinnaird, BOYCH's former counsel. Kinnaird testified to the discussion that took place among the parties where, among other things, the status and activities of Cool Rite were discussed. Tarin accused Pellonari and Diaz of ordering supplies through BOYCH and not paying for them. Pellonari maintained that Cool Rite had paid for all supplies which it had ordered. Tarin indicated at this time that the activities of Cool Rite were without his approval and against his interest and that Cool Heat was going to suffer because of the development and expansion of Cool Rite. A heated discussion also ensued regarding defendants' compensation. Eventually, a confrontational atmosphere developed and Pellonari and Diaz left. Tarin testified that after the meeting he tried several times to resolve the problem between himself and defendants, but his overtures failed and he filed his lawsuit.

### THE DECISION BELOW

The trial court heard evidence on defendants' affirmative defenses first. At the conclusion of this portion of the trial, the court held that plaintiff's claims for a constructive trust on behalf of himself and BOYCH (counts I and II) were barred by *laches*. The court further held that plaintiff's claim for an accounting (count V) was also barred by *laches* with the exception of the portion relating to the issue of defendants' salary.

The court then heard evidence on the remaining counts of plaintiff's cause of action. Following his case in chief, defendants moved for a directed finding on plaintiffs' claim for damages based on a misappropriation of the Cool Heat trademark (count III). The trial court granted a directed finding for defendants on the issue of damages but allowed the request for an injunction to stand. At the conclusion of all of the evidence, the court found for defendants on the remaining counts of plaintiff's cause of action (part of counts III and V, and all of count IV). Plaintiff filed a timely notice of appeal from the order of judgment.

OPINION

I

Tarin first contends that the trial court erred in applying the doctrine of *laches* to his claims for a constructive trust. He points out that the limitation period for his cause of action is five years and only 15 months had passed before he filed suit. He also asserts that no prejudice accrued to defendants during this time period.

*Laches* is an equitable doctrine which bars the assertion of a claim by a litigant whose unreasonable delay in raising that claim has prejudiced the opposing party. (*Tully v. State* (1991), 143 Ill. 2d 425, 432.) The doctrine is grounded in the equitable principle that courts are reluctant to come to the aid of a party who has knowingly slept on his rights to the detriment of the opposing party. (*Tully*, 143 Ill. 2d at 432.) Application of the *laches* doctrine lies within the sound discretion of the trial court, and its decision will not be reversed absent a clear abuse of discretion. *Finley v. Finley* (1980), 81 Ill. 2d 317, 330; *Rexroat v. Abatte* (1987), 163 Ill. App. 3d 796, 799; *Flower v. Valentine* (1985), 135 Ill. App. 3d 1034, 1042.

■■ Two elements are necessary to a finding of *laches*: (1) lack of diligence by the party asserting the claim; and (2) prejudice to the opposing party resulting from the delay. (*Tully*, 143 Ill. 2d at 432.) In this case, the trial court found that Tarin knew as early as 1988 that Pellonari and Diaz were in the process of opening a new radiator shop at the Pulaski address. He became aware in February of 1989 that the formation of Cool Rite had the potential of hurting BOYCH. Finally, Tarin knew as early as February 1989 that suppliers were shipping merchandise to Cool Heat which would be used by Cool Rite. Despite this knowledge, the trial court found that Tarin never expressed concern about the organization of Cool Rite or threatened Pellonari and Diaz with a lawsuit. Instead, Tarin waited until May 4, 1990, to file his lawsuit. While he was idly sitting on his rights, defendants were investing their time and money in starting up this new business by improving the real estate and developing relationships with customers and suppliers.

The trial court further noted that there was a strong inference that Tarin did not intend to file suit immediately because he wanted to see how successful Cool Rite would be before he invested money to hire a lawyer and assert his interest in a business that might not become successful. The court concluded Tarin's conduct was not the type of conduct which justified affirmative relief.

After careful review, we find that the record supports the trial court's findings of fact concerning the time when Tarin learned of defendant's activities. Furthermore, we conclude that the trial court did not abuse its discretion by applying *laches* to the case at bar.

## II

Plaintiff next contends that the trial court erred in refusing to award either injunctive relief or damages for defendants' alleged misappropriation of the Cool Heat trademark.

Under both State and Federal statutes, the principles of trademark law and the tests for infringement are the same as the ones traditionally applied at common law. (*Thompson v. Spring-Green Lawn Care Corp.* (1984), 126 Ill. App. 3d 99, 104.) Since the statutes themselves neither create a valid trademark nor establish new rights, the courts apply a single analysis to Federal, State, and common law claims. (*Thompson*, 126 Ill. App. 3d at 104.) Accordingly, we may look to Federal as well as State case law in order to resolve the issues before us.

■ The resolution of a trademark infringement claim involves a two-step analysis. First, the court must determine whether the mark used by the party alleging infringement is in fact a valid mark, *i.e.*, a legally protectable mark. Next, it must determine whether the infringer's use of a similar mark creates a "likelihood of confusion" on the part of the consuming public. *Thompson*, 126 Ill. App. 3d at 105.

■ Plaintiff argues that the court erred in refusing to grant an injunction because the manifest weight of the evidence indicates a likelihood of confusion. Plaintiff points out that the evidence demonstrated that (1) the defendants had circulated business cards containing the logos of both Cool Heat and Cool Rite and (2) the defendants instructed a former employee to pass out Cool Rite flyers while wearing a Cool Heat jacket. Evidence in the record ignored by plaintiff, however, is the fact that the complained-of conduct ceased. Plaintiff's only evidence of injurious conduct consisted of Esquivel's testimony that he distributed business cards with the logos of both businesses as late as April 1990, and that on one occasion in early 1989, he wore a Cool Heat jacket while passing out Cool Rite fliers. Esquivel ceased to be employed by Cool Rite as of April of 1990 and, therefore, had no knowledge of the defendants' business practices after that date. However, trial did not begin until June 1991. It is within the discretion of the trial court to grant or deny an injunction against conduct which has ceased and is not likely to recur. (*Schutt Manufacturing Co. v. Riddell, Inc.* (7th Cir. 1982), 673 F.2d 202, 207; *W.H. Brady Co. v.*

*Lem Products* (N.D. Ill. 1987), 659 F. Supp. 1355, 1368; *M—F—G Corp. v. Emra Corp.* (N.D. Ill. 1985), 626 F. Supp. 699, 705-06.) Assuming, *arguendo*, that a likelihood of confusion existed, we hold that the trial court did not abuse its discretion in refusing to grant an injunction on the facts of this case.

■ Next, plaintiff argues that the trial court erred in granting a directed finding for defendants on the issue of damages. The court directed a finding for defendants on this issue because plaintiff failed to present any evidence of damages resulting from actual consumer reliance on misleading statements. Plaintiff asserts that evidence of actual damage is not required because damage will be presumed upon a finding of likelihood of confusion. (See, *e.g., James Burrough Ltd. v. Sign of the Beefeater, Inc.* (7th Cir. 1976), 540 F.2d 266, 276.) Plaintiff argues that at a minimum, he should have been entitled to nominal damages.

However, plaintiff misunderstands the applicable law. A showing of a likelihood of confusion *alone* will suffice to support a grant of *injunctive relief.* (*Schutt*, 673 F.2d at 206.) In contrast, a higher standard of proof is required before the recovery of *money damages* will be allowed. (*Web Printing Controls Co. v. Oxy-Dry Corp.* (7th Cir. 1990), 906 F.2d 1202, 1205; *Schutt*, 673 F.2d at 206.) A party seeking such relief is required to show not only the likelihood of confusion, but also that it has been damaged by actual consumer reliance on the misleading statements. (*Web*, 906 F.2d at 1205; *Schutt*, 673 F.2d at 206.) We find that plaintiff failed to present any evidence of consumer reliance. Accordingly, we hold that the court applied the appropriate standard of law and did not err in directing a finding for the defendant on the issue of damages.

## III

Plaintiff next contends that the trial court erred by refusing to allow him to proceed on claims for statutory relief pursuant to the Illinois Consumer Fraud and Deceptive Practices Act (Consumer Fraud Act) (Ill. Rev. Stat. 1989, ch. 121½, par. 261 *et seq.*) and the Uniform Deceptive Trade Practices Act (Trade Practices Act) (Ill. Rev. Stat. 1989, ch. 121½, par. 311 *et seq.*).

■ First, plaintiff asserts that the court erred in granting the defendants' motion *in limine* to preclude any evidence relating to the statutory claims which were not alleged in plaintiff's complaint. We find that plaintiff has waived any objection to the trial court's refusal to allow him to present any evidence in addition to that contained within the record because he failed to make an offer of proof at trial

and, moreover, he has failed to argue in his appeal to this court that any additional evidence exists. See *Chicago Park District v. Richardson* (1991), 220 Ill. App. 3d 696, 701-02.

Next, plaintiff argues that the trial court abused its discretion in denying him leave to amend his complaint on the eve of trial to include the statutory claims. Plaintiff argues that the same facts and evidence supported both statutory and common law claims and, therefore, since no additional evidence was needed to support the statutory claims, no surprise or prejudice would have accrued to the defendants. However, we need not determine whether the trial court erred in refusing to allow plaintiff to amend his complaint and pursue statutory claims for trademark misappropriation because the record indicates that plaintiff could not have recovered under these theories had he been allowed to include them in his complaint.

■■ We turn first to an examination of the Trade Practices Act. The Trade Practices Act provides two potential remedies: injunctive relief and, in certain cases, attorney fees. (Ill. Rev. Stat. 1989, ch. 121½, par. 313.) In order to be eligible for injunctive relief under the Trade Practices Act, plaintiff must demonstrate that he is likely to be damaged in the future by defendants' conduct. (*Glazewski v. Coronet Insurance Co.* (1985), 108 Ill. 2d 243, 253; *American Pet Motels, Inc. v. Chicago Veterinary Medical Association* (1982), 106 Ill. App. 3d 626, 633.) As we discussed above, the record indicates that the conduct of which plaintiff complains has ceased. Plaintiff's only evidence of injurious conduct on the part of defendants consisted of Esquivel's testimony that he distributed business cards with the logos of both Cool Rite and Cool Heat as late as April 1990, and that on one occasion in early 1989, he wore a Cool Heat jacket while passing out Cool Rite fliers. Esquivel ceased to be employed by Cool Rite as of April of 1990 and, therefore, had no knowledge of defendants' business practices after that date. We find that plaintiff presented no evidence demonstrating a threat of future harm and, therefore, he would not have been entitled to injunctive relief under the Trade Practices Act even if he had been allowed to amend his complaint to include such a claim.

In order to recover attorney fees under the Trade Practices Act, plaintiff must demonstrate to the satisfaction of the court that the defendants had *wilfully* engaged in deceptive trade practices. (Ill. Rev. Stat. 1989, ch. 121½, par. 313.) Assuming, *arguendo*, that defendants' conduct did amount to deceptive trade practices, the record does not support a finding that the defendants acted wilfully. Hence, plaintiff would not have been entitled to attorney fees under

the Trade Practices Act even if he had been allowed to amend his complaint to include such a claim.

■ We also find that plaintiff could not have recovered under the Consumer Fraud Act. The Consumer Fraud Act provides a private cause of action in cases only where the plaintiff can show that he suffered *damage* as a result of the unlawful conduct proscribed by the statute. (*Duran v. Leslie Oldsmobile, Inc.* (1992), 229 Ill. App. 3d 1032, 1040.) As the *Duran* court aptly explained:

> "[A]lthough a *violation* of the Consumer Fraud Act may occur in the absence of damages, a *private cause of action* does not arise absent a showing of both a violation and resultant damages. [There is] a distinction between a violation absent damages, which the Attorney General may prosecute (Ill. Rev. Stat. 1989, ch. 121½, par. 263), and a violation causing damages, which either the Attorney General or a private party may pursue (Ill. Rev. Stat. 1989, ch. 121½, par. 270a)." (Emphasis in original.) (*Duran*, 229 Ill. App. 3d at 1040.)

As we discussed earlier, plaintiff has not demonstrated any damage which resulted from the defendants' conduct. Absent evidence of damages, plaintiff could not have pursued a private cause of action under the Consumer Fraud Act even if he had been allowed to amend his complaint to include such a claim.

For all the foregoing reasons, we find that the court did not commit reversible error in refusing to allow plaintiff to amend his complaint and pursue statutory claims for trademark misappropriation.

### IV

Plaintiff maintains that the trial court erred in refusing to remove the defendants from their positions as directors of BOYCH. Specifically, plaintiff argues that the trial court applied the wrong standard of proof when it required him to demonstrate by clear and convincing evidence that Pellonari and Diaz acted wrongfully.

■ Section 8.35(b) of the Business Corporation Act provides that the circuit court may remove a director from office if the court finds that "(1) the director is engaged in fraudulent or dishonest conduct or has grossly abused his or her position to the detriment of the corporation, and (2) removal is in the best interest of the corporation." (Ill. Rev. Stat. 1989, ch. 32, par. 8.35.) The statute does not address the burden of proof necessary to sustain an action for removal. Borrowing from the common law, the trial court held that fraudulent or dishonest conduct must be proven by clear and convincing evidence, while the remaining elements of the statute were subject to the familiar

preponderance standard. Applying these standards, the court concluded that the plaintiff failed to meet either prong of the statute.

■■ Plaintiff maintains that the court erred in applying a clear and convincing standard to the first prong of the statute. Plaintiff posits that because the wrongdoing with which defendants were charged amounts to self-dealing, the burden of proof is on the defendants to prove by a preponderance that their transactions were fair and reasonable. (See, e.g., Romanik v. Lurie Home Supply Center, Inc. (1982), 105 Ill. App. 3d 1118.) Plaintiff's argument is misplaced. Whether or not the defendants have engaged in self-dealing is not the relevant inquiry under this statute. The statute does not authorize the circuit court to remove directors who engage in self-dealing; instead, it requires the trial court to find proof of fraud.

It has been established in numerous contexts that fraud must be proved by clear and convincing evidence. (See, e.g., Regenold v. Baby Fold, Inc. (1977), 68 Ill. 2d 419, 431 (petition to set aside consent to adoption); In re Thompson (1963), 30 Ill. 2d 560 (attorney disciplinary proceeding); Horney v. Hayes (1957), 11 Ill. 2d 178 (suit to set aside sale of beneficial interest in a land trust).) Accordingly, we hold that the trial court did not err in requiring the plaintiff to prove fraudulent or dishonest conduct by clear and convincing evidence.

V

Plaintiff argues that the trial court erred in refusing to order an accounting. We disagree.

The right to an accounting is not an absolute right, but one which should be accorded only on equitable principles. (Netisingha v. End of the Line, Inc. (1982), 107 Ill. App. 3d 275, 278; Nieberding v. Phoenix Manufacturing Co. (1961), 31 Ill. App. 2d 350, 356.) There are no guidelines for determining when an accounting is warranted because the need for such relief is dependent upon the particular facts of each case. (Agrimerica, Inc. v. Mathes (1990), 199 Ill. App. 3d 435, 452; Ferrara v. Collins (1983), 119 Ill. App. 3d 819, 822.) However, it is axiomatic that an accounting will not be ordered if the circumstances are such as to make it unnecessary or improper. (See, e.g., Netisingha, 107 Ill. App. 3d at 278; Nieberding, 31 Ill. App. 2d at 356.) The plaintiff has the burden of establishing the right to the desired accounting. Netisingha, 107 Ill. App. 3d at 278.

There appears to be some confusion as to the proper standard of review to apply to an action for an accounting. Several appellate court decisions have applied both an abuse of discretion standard as well as a manifest weight of the evidence standard within the same

opinion. (See, *e.g.*, *Agrimerica, Inc. v. Mathes* (1990), 199 Ill. App. 3d 435, 452; *Ferrara v. Collins*, 119 Ill. App. 3d at 822; *Ferrell v. Plasti-Drum Corp.* (1987), 159 Ill. App. 3d 936, 940.) We need not resolve this enigma at this time, however, because we find that the trial court's determination that an accounting was unnecessary was correct under both standards.

■■■ The only portion of the plaintiff's claim for an accounting which was not barred under the *laches* doctrine concerned the amount by which the defendants had raised their salaries. The defendants admitted that they raised their salary by $100 per week. The evidence at trial indicated that Tarin learned of the increase in the defendants' salary while reviewing financial statements which he regularly received from BOYCH's accountant. The trial court concluded that an accounting was unnecessary because even if there were grounds for the plaintiff to obtain certain credits from the defendant, there was no complexity in the identification or discovery of the amounts claimed to be owed to plaintiff. We conclude that the findings of the court are not against the manifest weight of the evidence and that the trial court did not abuse its discretion in refusing to order an accounting on the issue of the defendants' salary increase.

## VI

Finally plaintiff complains that the trial court erred by permitting defense counsel to conduct an improper impeachment of Tarin. Plaintiff's argument is without merit.

An appropriate method of testing the credibility of a witness is to demonstrate that on a prior occasion the witness made statements inconsistent with his or her trial testimony. (*Sommese v. Maling Brothers, Inc.* (1966), 36 Ill. 2d 263, 268.) To be used for impeachment, a prior statement of a witness must be materially inconsistent with his or her testimony at trial. (*Thompson v. Abbott Laboratories* (1990), 193 Ill. App. 3d 188, 205.) Whether to allow the admission of evidence for impeachment purposes is within the trial court's discretion, and a reviewing court will not disturb its decision absent an abuse of discretion. *Thompson*, 193 Ill. App. 3d at 205.

At trial plaintiff was questioned as follows:

"Q. Has anyone ever told you that Jose Diaz or Ken Pellonari took goods from Cool Heat and sent them to Cool Rite?

A. Yes, that's right.

Q. Someone has told you that?

A. Yes.

Q. Have you ever given a different answer, sir?

A. I don't remember.

Q. Do you remember your deposition on April 25, 1991 at my offices? Page 35, where the following questions were asked and you gave the following answer?"

Plaintiff's deposition testimony at page 35, lines 2 through 7 states:

"Q. Has anyone ever told you that Jose Diaz has taken goods from Cool Heat over to Cool Rite?

A. No.

Q. Has anyone ever told you that Kenneth Pellonari has taken goods from Cool Heat over to Cool Rite?

A. No."

Plaintiff argues that because the word "sent" exists in the question asked at trial but is absent from the question in the deposition, and because the word "over" is present only in the question from the deposition, the two questions request different information and, therefore, the fact that plaintiff gave two different answers does not demonstrate inconsistency. We disagree. Although the questions are phrased in a slightly different manner, they ask for essentially the same information. Therefore, the fact that plaintiff gave two different responses to these questions does demonstrate a material inconsistency. Accordingly, we find that the trial court did not abuse its discretion in admitting plaintiff's deposition testimony for purposes of impeachment.

For all of the foregoing reasons, we affirm the judgment of the circuit court.

Affirmed.

GORDON, P.J., and McNULTY, J., concur.