2021 IL App (1st) 192521

No. 1-19-2521

Opinion filed March 24, 2021

Third Division

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| RONALD TUFO, Individually and Derivatively on Behalf of Discount Fence, Inc., | ) ) ) | Appeal from the Circuit Court of Cook County |
| Plaintiff-Appellant and Cross-Appellee, | ) ) | No. 14 CH 000783 |
| v. | ) ) | Honorable |
| RICHARD TUFO, | ) ) | Moshe Jacobius, Judge Presiding. |
| Defendant-Appellee and Cross-Appellant. | ) | |

JUSTICE BURKE delivered the judgment of the court, with opinion.
Presiding Justice Howse and Justice Ellis concurred in the judgment and opinion.

**OPINION**

¶ 1      This is an appeal from an order of the circuit court finding that defendant, Richard Tufo, breached his fiduciary duty to Discount Fence, Inc. (Discount Fence) as a shareholder of the corporation by usurping corporate opportunities and by using the Discount Fence corporate line of credit for his personal profit. The court found, however, that plaintiff, Ronald Tufo, individually and derivatively on behalf of Discount Fence,[1] did not have standing to bring a derivative action

---

[1]Hereinafter, references to "plaintiff" will refer to Ronald Tufo individually, unless otherwise noted.

on behalf of Discount Fence because plaintiff knew about defendant's wrongful conduct prior to becoming a shareholder and because of plaintiff's personal animosity toward defendant. The court also determined that, despite its finding that defendant had breached his fiduciary duty to Discount Fence, plaintiff had failed to present specific evidence of damages stemming from that breach. The court further found that plaintiff was not entitled to an equitable accounting because he did not have standing to maintain a derivative action and because plaintiff had received all of Discount Fence's books and records through discovery during the course of the litigation.

¶ 2 On appeal, plaintiff raises numerous contentions. Plaintiff first contends that the trial court erred in finding that he lacked standing to bring a derivative action where the court had previously ruled that defendant had waived any challenge to plaintiff's standing. Plaintiff further contends that the court misapplied the law in denying him relief based on his presumed knowledge of defendant's wrongdoing because plaintiff had only general knowledge of defendant's wrongful conduct but was not aware of the specific transactions that gave rise to defendant's breach of fiduciary duty. Plaintiff also asserts that the court erred in finding that he could not maintain a derivative action because his claim was rooted in personal animosity for defendant and because plaintiff personally, rather than Discount Fence, would benefit from a favorable ruling. Plaintiff next contends that the court erred in applying the doctrine of unclean hands, finding that plaintiff had also borrowed money from Discount Fence and committed other wrongs against the corporate interest. Plaintiff finally asserts that the court erred in finding that he failed to prove specific damages with respect to defendant's breach of fiduciary duty and in finding that he was not entitled to an equitable accounting.

¶ 3 Defendant also raises two contentions on cross-appeal that he asserts were raised at trial but not addressed in the trial court's ruling. Defendant seeks to preserve these arguments for

appeal. Defendant first asserts that plaintiff's claims were time-barred by the five-year statute of limitations for a claim of breach of fiduciary duty. Defendant also contends that all the conduct that plaintiff now challenges was ratified by Discount Fence's shareholders.

¶ 4                                    I. BACKGROUND

¶ 5                                 A. Pretrial Proceedings

¶ 6                          1. *Discount Fence and Initial Complaint*

¶ 7      The record shows that Discount Fence is a corporation located in Cook County, Illinois. Upon its incorporation in 1974, 50% of the shares were issued to August Tufo (August), plaintiff and defendant's father, and 50% of the shares were issued to defendant. Defendant also assumed the role of president of the company. August died in 1976, leaving his 50% shareholder interest to his wife, Luella Tufo (Luella), who is the mother of both plaintiff and defendant. Defendant continued as the president of Discount Fence, and Luella held various positions on the company's board of directors but was never directly involved with the business. Plaintiff was vice president of the company, and the parties' other siblings variously worked for Discount Fence over the years, but defendant and Luella remained the only shareholders.

¶ 8      In September 2013, Luella assigned her 50% share in Discount Fence to plaintiff via a written share transfer agreement (Share Transfer Agreement). In November 2013, plaintiff sent defendant a statutory demand to review Discount Fence's books and records asserting that he raised concerns with defendant "[i]n the past" concerning how Discount Fence's funds were being spent. After receiving no response to the statutory demand, plaintiff filed a six-count complaint in the circuit court contending that defendant had been misusing Discount Fence's assets for his personal gain. Plaintiff sought, *inter alia*, injunctive relief, an accounting, and appointment of a receiver based in part on defendant's repeated breaches of fiduciary duty to Discount Fence.

Defendant filed a motion to dismiss, which the trial court denied. The parties then engaged in a protracted discovery process where each party sought a variety of documents related to both Discount Fence and the parties' personal finances.

¶ 9    Defendant subsequently filed a second motion to dismiss the complaint pursuant to both sections 2-615 and 2-619 of the Code of Civil Procedure (Code) (735 ILCS 5/2-615, 2-619 (West 2014)). The circuit court granted the motion, finding that the complaint lacked specificity; however, the court continued the case for "complete discovery" and to set a date for plaintiff to file a new complaint. Defendant then filed a motion to dismiss the matter "in its entirety" pursuant to section 2-615 of the Code. The trial court denied defendant's motion and granted plaintiff 14 days to file an amended complaint.

¶ 10                                  2. *Amended Complaint*

¶ 11   Plaintiff filed his amended complaint in March 2015. In the amended complaint, plaintiff repeated the allegations raised in his initial complaint and included additional supporting facts. Plaintiff asserted that, despite defendant's annual salary from Discount Fence of $50,000 per year, defendant "amassed a personal fortune" of approximately $2.5 million in net worth. Plaintiff believed that defendant had amassed this fortune by misappropriating Discount Fence's funds and opportunities. Plaintiff asserted that defendant misappropriated funds from Discount Fence to purchase real property, establish investment accounts, and purchase personal property. Plaintiff further contended that defendant used these misappropriated funds to purchase property leased by Discount Fence and then charged Discount Fence inflated rent for his own personal benefit. Plaintiff asserted that defendant acquired two other companies, SteelCo Corporation (SteelCo) and Roma Fence Company, Inc. (Roma), while working for Discount Fence. Both companies, like

Discount Fence, were involved in the fencing industry. Plaintiff contended that defendant would use these companies to funnel Discount Fence funds to himself.

¶ 12 Based on that factual background, plaintiff raised six claims. In count I, plaintiff sought injunctive relief allowing him to inspect Discount Fence's books and records pursuant to section 7.75 of the Business Corporation Act of 1983 (Act) (805 ILCS 5/7.75 (West 2014)). In count II, plaintiff asked the court to set aside the improper actions that defendant took as Discount Fence's president, remove defendant as a director of Discount Fence, and appoint plaintiff as president of the company. In count III, plaintiff sought permanent injunctive relief again seeking access to Discount Fence's books and records. Plaintiff also sought an order enjoining defendant from converting any of Discount Fence's assets or corporate documents. Plaintiff further requested that the court enjoin defendant from making any withdrawals or disbursements from Discount Fence's accounts. In count IV, plaintiff raised a claim for breach of fiduciary duty. Plaintiff asserted that defendant breached his fiduciary duty as an officer, director, and shareholder of Discount Fence by diverting and misappropriating funds and opportunities belonging to Discount Fence. Plaintiff asserted that the breaches caused damages to plaintiff and Discount Fence "in excess of $50,000." In count V, plaintiff sought an accounting of Discount Fence's books and records pursuant to the Act in order for plaintiff to determine the amount of his damages. Plaintiff asserted that he "will not be able to discover the extent of its damages without an accounting." Finally, in count VI, plaintiff sought an appointment of a receiver to operate Discount Fence's business for the benefit of all the shareholders.

¶ 13 Defendant filed a motion to dismiss plaintiff's amended complaint, contending that plaintiff had failed to plead sufficient factual allegations to support his claims. Defendant further asserted that the court should dismiss plaintiff's amended complaint because plaintiff sought to

bring a derivative action for alleged acts that took place before he became a shareholder. Defendant asserted that the Act permits shareholders to bring derivative suits only for actions that occurred while they were shareholders. Defendant recognized that the Act provided an exception to this general rule where there is a continuing wrong, but he asserted that plaintiff did not meet his burden on this exception because he made only vague, unsupported allegations of wrongdoing. Defendant further asserted that plaintiff was aware of the alleged misappropriation of funds prior to becoming a shareholder and therefore could not now raise the impropriety of those actions in a derivative suit.

¶ 14                              3. *September 2015 Order*

¶ 15    The court ruled on defendant's motion to dismiss in a written order in September 2015. In the order, the court rejected defendant's claim that plaintiff's amended complaint was deficient because it failed to allege specific facts and evidence. The court noted that, while a plaintiff's complaint is required to set forth facts that give rise to his cause of action, the complaint is not required to set forth evidence proving those facts. The court found that plaintiff's amended complaint was adequately specific. Nonetheless, the court found that counts I and III of plaintiff's amended complaint, where he sought to inspect Discount Fence's books and records, improperly pled the elements required for injunctive relief, rather than stating a cause of action. Accordingly, the court dismissed counts I and III of plaintiff's amended complaint with prejudice pursuant to section 2-615 of the Code (735 ILCS 5/2-615 (West 2014)). The court also dismissed with prejudice count VI of the amended complaint because it merely sought a remedy rather than stated a cause of action. The court found, however, that counts II (set aside corporate actions) and V (accounting) adequately stated causes of action. With regard to count IV, the court found that, although plaintiff was entitled to bring a derivative cause of action, he could not maintain the claim

"individually." The court found that plaintiff's claims of self-dealing could only be brought derivatively, absent an allegation that plaintiff suffered some individualized harm separate and apart from the harm suffered by Discount Fence. The court therefore dismissed count IV to the extent that plaintiff asserted a cause of action as an individual shareholder but found that count IV adequately pled a derivative action and denied the motion to dismiss the derivative cause of action.

¶ 16                              4. *Defendant's Affirmative Defenses and Counterclaim*

¶ 17    Following the court's September 2015 order, defendant filed an answer and affirmative defenses to plaintiff's amended complaint. In his first affirmative defense, defendant asserted that plaintiff was aware that members of the Tufo family regularly took loans from Discount Fence and that plaintiff himself had taken such loans. Defendant asserted that plaintiff was therefore estopped from raising a claim based on this practice where plaintiff had "helped create the circumstances whereby it was accepted that loans would be taken out against the business assets provided they were repaid." In his second affirmative defense, defendant contended that the conduct plaintiff complained of occurred prior to the time plaintiff acquired his 50% share in Discount Fence. Defendant asserted that the other 50% shareholder at the time, Luella, did not object to the conduct plaintiff identified in his amended complaint.

¶ 18    On the same day defendant filed his answer and affirmative defenses, defendant also filed a counterclaim against plaintiff. In his counterclaim, defendant asserted that plaintiff had incorporated Fence It Corporation d/b/a Discount Fence South Holland (Fence It), a business involved in the fencing industry. Defendant asserted that Fence It was a direct competitor to Discount Fence and plaintiff had misappropriated funds and materials belonging to Discount Fence in order to establish and operate Fence It. Defendant sought injunctive relief compelling plaintiff

to cease operating Discount Fence and an order setting aside plaintiff's corporate actions with regard to Discount Fence and Fence It during the period plaintiff was involved in both businesses.

¶ 19    Defendant later filed an amended counterclaim repeating the allegations made in the original counterclaim and seeking monetary damages based on an accounting as well as attorney fees and punitive damages. Defendant also filed amended affirmative defenses and an amended answer to plaintiff's amended complaint. In his amended affirmative defenses, defendant raised the defense of *laches*, repeating his assertion that plaintiff was aware for many years that members of the Tufo family regularly took loans from Discount Fence and that plaintiff himself had taken such loans.

¶ 20                               5. *Motion for Summary Judgment*

¶ 21    Defendant then filed a motion for summary judgment asserting that plaintiff lacked standing to obtain relief under the Act as alleged in count II of his complaint for any acts that occurred before plaintiff became a shareholder of Discount Fence. Defendant contended that plaintiff also lacked standing to bring a derivative action under count IV of his complaint because his allegations were vague and based on events that occurred before he became a shareholder. Defendant further asserted that plaintiff's claim for an accounting was moot because plaintiff had obtained copies of Discount Fence's books and records through discovery.

¶ 22                               6. *November 2017 Order*

¶ 23    The court ruled on defendant's motion for summary judgment in a written order in November 2017. With regard to plaintiff's standing to seek relief under the Act, the court found that defendant raised this claim regarding plaintiff's standing for the first time in his motion for summary judgment, nearly three years after plaintiff filed the original complaint. The court therefore found that defendant failed to raise his standing defense in a timely fashion and had

waived the objection. The court further found that, even assuming no waiver, plaintiff's claims were based on information he learned after obtaining his shares. As such, the court would permit plaintiff the opportunity to show that he had obtained his shares in Discount Fence before defendant's actions were disclosed to the public and, therefore, before plaintiff was aware of defendant's wrongdoing. If plaintiff met that burden, then he would have standing to bring a claim under the Act. Accordingly, the court denied defendant's motion for summary judgment with regard to count II of plaintiff's amended complaint.

¶ 24   With regard to plaintiff's standing to bring a derivative action, the court likewise found that defendant had waived this defense by raising it for the first time in his motion for summary judgment filed nearly three years after the filing of the original complaint. The court further found that, even if it found no waiver, plaintiff would be permitted to bring the claim under the Limited Liability Company Act. Accordingly, the court denied defendant's motion for summary judgment with regard to count IV of plaintiff's amended complaint.

¶ 25   Finally, the court found that plaintiff's claim for an accounting was not moot merely because defendant had produced the requested financial documentation. The court noted that plaintiff's claim was based on a defendant's breach of fiduciary duty and that the amount of damages caused to Discount Fence as a result of defendant's breach could not be determined without an accounting. The court therefore denied defendant's motion for summary judgment with respect to count V of plaintiff's amended complaint.

¶ 26                                    B. Trial Testimony

¶ 27   At trial, defendant testified that Discount Fence started in Harvey, Illinois, and was incorporated by him and his father, August, in 1974. At that time, the company issued 1000 shares of stock, 500 to defendant and 500 to August. Defendant was the president, and August was named

the secretary and treasurer. August died in 1976, leaving his 500 shares in Discount Fence to Luella. Luella never actively participated in the business. In 1977, the company moved to South Holland, Illinois. The property in South Holland was owned by Luella, and Discount Fence paid her rent for use of the property. Defendant did not think of Discount Fence as a "family business" but acknowledged that each of his brothers had worked for Discount Fence at some point. Defendant acknowledged that he took loans from Discount Fence to purchase personal property and for other personal reasons, but he testified that he always paid back the loaned amounts.

¶ 28 In 1981, Discount Fence opened a second location in Downers Grove. Defendant personally purchased the property and then rented it to Discount Fence. Defendant testified that he did not have a written lease agreement with Discount Fence and that Discount Fence's rental payments varied based on how the business performed. Defendant testified that, when the business was not performing well, it would pay him less in rent but then it would make up those amounts and pay "additional rent" in years when the business was performing better.

¶ 29 Defendant also testified regarding his involvement in SteelCo and Roma. Defendant testified that SteelCo was a California company that he personally purchased nearly 30 years ago because it manufactured a proprietary material for the fencing industry. Defendant initially testified that he owned 100% of SteelCo but later testified that Luella also owned a minority share of the company. Defendant testified that SteelCo no longer manufactured the proprietary product but still owned a large amount of materials. Discount Fence and SteelCo shared a warehouse near the Discount Fence South Holland office, where both Discount Fence and SteelCo stored materials. The warehouse was owned by a third party and rented by SteelCo. Discount Fence would pay rent to SteelCo as a subtenant. Sometimes, however, Discount Fence would pay the entire portion of the rental payments directly to the third-party property owner on SteelCo's behalf.

¶ 30    SteelCo also sold fencing material to Discount Fence. SteelCo occasionally sold material to other businesses, but Discount Fence was its primary customer. Defendant testified that in some cases Discount Fence would prepay for SteelCo material at the end of the year. Defendant testified that he made these end-of-year transfers to minimize Discount Fence's tax liability. SteelCo did not have any employees aside from defendant, but it used Discount Fence's accountants to keep track of its finances on Discount Fence's computer system. Defendant testified that SteelCo would not pay Discount Fence for these services but instead gave it a discount on materials. Defendant acknowledged, however, that the price Discount Fence paid to SteelCo for material was based, at least in part, on the current price of steel.

¶ 31    With regard to Roma, defendant testified that he purchased the business from a family friend in 1989. Defendant testified that plaintiff also had an ownership interest in Roma. Roma was largely defunct, but defendant kept it in business because it had already been incorporated. Defendant testified that he never took a salary, dividend, or other payment from SteelCo or Roma. Defendant acknowledged, however, that he had taken a loan from Roma in the late 1990s that was still outstanding.

¶ 32    Defendant also testified extensively regarding his finances, including his real estate holdings, his capital gains and losses, and his salary from Discount Fence. Over the years, defendant had bought and sold several pieces of real estate in the Chicago area. Defendant testified that, around 2000, he loaned $250,000 to a friend who worked for Krupa Development (Krupa). Defendant obtained the $250,000 using the Discount Fence line of credit with Chase Bank, which defendant personally guaranteed. In exchange for the loan, Krupa deeded defendant a condominium unit in a new development. Krupa eventually repaid the loan to defendant, and defendant repaid the $250,000 to Chase Bank in Discount Fence's line of credit. Defendant

eventually sold the condominium for $389,000 and retained the profits from that sale. Defendant testified that his salary from Discount Fence was around $50,000 per year. Defendant had also used Discount Fence funds to purchase stock in investment accounts. Defendant testified, however, that he paid the borrowed amounts back but retained the profits from the stock sales. SteelCo's, Roma's, and defendant's personal tax returns were admitted into evidence.

¶ 33    Plaintiff testified that he had been working at Discount Fence since 1977 and served as the company's vice president and was the sole member of the company's board of directors. In early 2013, at a time when plaintiff believed he was a member of the board of directors, plaintiff attempted to remove defendant as president of Discount Fence for "misuse of funds" and "absenteeism." Defendant and Luella then held a shareholders meeting and voted to remove plaintiff from Discount Fence in June or July 2013, but plaintiff was unable to remove defendant because he was not a shareholder. In September 2013, Luella transferred her 50% share in Discount Fence to plaintiff via the Share Transfer Agreement. Plaintiff did not pay Luella for the shares. Plaintiff testified that he wanted Luella's shares because he was concerned about defendant's misuse of Discount Fence funds. Plaintiff believed that defendant was misappropriating the corporate funds because, despite Discount Fence earning a profit at the end of each year, Discount Fence would always have to borrow money from the bank at the beginning of the following year.

¶ 34    Accordingly, plaintiff made a statutory demand to defendant for access to Discount Fence's books and records. Defendant did not respond to the demand and refused to give plaintiff access to Discount Fence's books and records. Defendant then unilaterally moved all of the business's assets to Discount Fence's Downers Grove location, while plaintiff stayed in the South Holland location. Plaintiff did not have access to any of Discount Fence's assets, so he incorporated a new business, Fence It. Plaintiff testified that he used Discount Fence's materials to get Fence It "up

and running" and deposited checks intended for Discount Fence into Fence It's bank account. Defendant returned to the South Holland location a few times to retrieve materials, but eventually plaintiff changed the locks on the building, denying defendant access.

¶ 35 Plaintiff acknowledged that he took personal loans from Discount Fence and used the money to purchase real estate. He testified, however, that he paid back the loaned amounts. He also testified that he would use the Discount Fence corporate credit cards for personal expenses. Plaintiff's testimony suggested that he sometimes reimbursed the company for those expenses, but sometimes he did not and referred to these unreimbursed expenses as "perks." Plaintiff testified that he knew for years before becoming a shareholder that defendant had taken personal loans from Discount Fence and was aware since at least 2005 that Discount Fence paid money to SteelCo.

¶ 36 Luella testified that, during her time as a shareholder, she relied on defendant to run Discount Fence and trusted him to run the business in the best interests of the corporation. She testified that she did not intend to give plaintiff her ownership interest in Discount Fence when she executed the Share Transfer Agreement. Luella did not have any knowledge of Discount Fence's, Roma's, or SteelCo's finances and was not involved in the business of any of those corporations.

¶ 37 Marie Dancu was qualified as an expert in accounting, and the court also permitted her to opine on forensic accounting issues if they were within the purview of an accountant's knowledge and abilities. Dancu testified that her ability to form an opinion regarding Discount Fence's and defendant's finances was limited because she had access only to a condensed version of the QuickBooks file that Discount Fence used to track its finances. Discount Fence used the QuickBooks program to track its transactions and expenses. With this condensed version, Dancu could see only monthly summaries of Discount Fence's business. Nonetheless, Dancu opined that defendant's income, as reflected on his tax returns, did not support his lifestyle. She testified that

defendant was living "a little excessive towards his ability, his income ability, his lifestyle was a little excessive." Dancu also questioned some of the transactions that took place between Discount Fence, Roma, SteelCo, and defendant. Dancu noted that there were loans and payments to defendant and Luella noted on the Discount Fence and SteelCo ledgers that did not have corresponding documentation, such as promissory notes. The court then asked Dancu what information she would need to perform a full accounting in this case. Dancu responded that she would need the uncondensed QuickBooks file. At that point, the court recessed the trial and ordered defendant to turn over all the information Dancu needed to perform a full accounting or, if defendant did not have access to the information that Dancu required, then to explain why the information was missing.

¶ 38    The trial resumed nearly a year later, and Dancu testified that she had reviewed additional documentation, including an uncondensed version of Discount Fence's QuickBooks file. With regard to shareholder loans, Dancu noted that the Internal Revenue Service had guidelines for whether a shareholder loan was actually a loan or whether it was in reality compensation. Dancu noted that, when Discount Fence loaned money to shareholders during the year, there were no corresponding promissory notes. Dancu noted that promissory notes were only made at the end of the year if there was a balance due on the loan. Under this scheme, a shareholder could take out a loan, but as long as the loan was paid back before the end of the year, there was no promissory note created. Dancu noted that there were also no minutes from Discount Fence board meetings indicating that the loans were approved by the board of directors.

¶ 39    Dancu observed that defendant used some of the loaned funds to purchase stock, which he then sold at a profit. He used the profit from the stock sale to pay back the loan to Discount Fence.

Dancu also noted that defendant used Discount Fence corporate credit cards to purchase personal items. The amounts were not approved by the board or memorialized by promissory notes.

¶ 40    With regard to rent payments from Discount Fence to defendant for the Downers Grove facility, Dancu testified that, when a company pays rent to a shareholder, it should be an arm's length transaction. She also testified that there should be a written lease detailing the terms of the agreement, although she acknowledged that a written lease was not required. Dancu testified that from 2004 through 2013 Discount Fence paid defendant "additional rent" of $73,000, which defendant used to pay down his shareholder loan balance. She also noted that between 1999 and 2013 Discount Fence paid SteelCo more than $1 million. She testified that most of these payments were for materials and rent, but she could not track more than $300,000 of the payments. She noted that most of this $300,000 was based on three transactions, two that occurred in 2000 and one that occurred in 2002. She also noted that SteelCo's rent payments on the warehouse were $3,300, but when Discount Fence paid rent to SteelCo as a subtenant, it often paid more $3,300.

¶ 41    Dancu also noted that defendant borrowed money using Discount Fence's line of credit and then used that money to pay down his shareholder loan. When the trial court asked Dancu to clarify that point, she explained that defendant essentially used Discount Fence funds to pay down his shareholder loan to Discount Fence. Dancu concluded that it appeared that defendant was using corporate funds to "self-deal" and "enrich his personal assets."

¶ 42    Defendant also presented the testimony of an expert witness, Samuel Cutrara. He was qualified as a certified public accountant to give testimony regarding Dancu's testimony and expert disclosures. Defendant's counsel attempted to elicit a variety of opinions from Cutrara regarding Discount Fence's financial data, but the court repeatedly upheld plaintiff's objections that the opinions were beyond the scope of his disclosed testimony. Cutrara briefly testified that

shareholder loans were common and problems arise only when the loans were not repaid. Cutrara observed that all of the shareholder loans from Discount Fence appeared to have been repaid, but he could not discern whether the shareholders paid interest on those loans.

¶ 43                                   C. Final Order

¶ 44    Following posttrial submissions by the parties containing their proposed findings of fact and conclusions of law, the court issued its judgment in a 50-page written order (final order). The court outlined at length the factual background of the parties, Discount Fence, and the evidence adduced at trial. The court determined that there were four issues it was required to resolve:

"whether [plaintiff] became a shareholder [of Discount Fence] when Luella transferred her shares to [plaintiff], at no cost, by a notarized Share Transfer Agreement; (2) whether [defendant] breached his fiduciary duty when he engaged in rental agreements with the company without leases, did not tender business opportunities to Discount Fence, and used Discount Fence assets to sustain operations for another company; (3) Whether Luella and [plaintiff] knew about possible misappropriation by [defendant] when they executed the share transfer to allow [plaintiff] to pursue legal action under the [Act]; (4) whether [plaintiff] is entitled to an equitable accounting of Discount Fence funds based on any breach of fiduciary duty by [defendant]."

¶ 45    With regard to the first issue, the court found that plaintiff became a 50% shareholder of Discount Fence when Luella executed the Share Transfer Agreement.[2] The court further found that defendant breached his fiduciary duty to Discount Fence when he acquired SteelCo and used

---

[2]Whether plaintiff became a shareholder of Discount Fence as a result of the Share Transfer Agreement was a contested issue at trial, but defendant does not raise this issue on appeal and acknowledges the court's finding that plaintiff became a 50% shareholder of Discount Fence when Luella and plaintiff executed the Share Transfer Agreement in September 2013.

Discount Fence funds for SteelCo's operation. The court found that defendant also breached his fiduciary duty when he used Discount Fence's line of credit to profit from a personal transaction with Krupa. The court found, however, that plaintiff did not have standing to bring a derivative shareholder action on behalf of Discount Fence because plaintiff knew about the wrongdoing prior to the share transfer and because of the personal "animosity" between him and defendant. The court also found that plaintiff's claims were barred by the unclean hands doctrine because plaintiff had also personally profited from loans from Discount Fence. The court also found that, despite defendant's breach of fiduciary duty, plaintiff had failed to present specific evidence of his or Discount Fence's damages. The court concluded that plaintiff was not entitled to an accounting because he did not have standing and, in any event, because he had access to the QuickBooks files and other documentation, which would make an accounting moot. This appeal follows.

¶ 46                                II. ANALYSIS

¶ 47     On appeal, plaintiff contends that the court erred in finding that he did not have standing to bring a derivative action where it had previously found in the November 2017 order that defendant had waived his objections to plaintiff's standing. Plaintiff further contends that the court erred in applying the doctrine of unclean hands because much of plaintiff's activity the court cited occurred after plaintiff filed the suit, which had no bearing on defendant's complained-of conduct. Plaintiff also contends that the court erred in finding that he had failed to prove damages with respect to defendant's breach of fiduciary duty and improperly shifted the burden of accounting to plaintiff. Finally, plaintiff contends that the court erred in refusing to order defendant to account.

¶ 48                                A. Standing

¶ 49     The trial court found that plaintiff lacked standing in two distinct respects. First, the court found the record showed "clear and pervasive animosity" between plaintiff and defendant. The

court found that this "personal motive" disqualified plaintiff from bringing a derivative action because plaintiff, as the only other shareholder, is the only person who would financially benefit from the action. The court found that this case represented a situation where plaintiff simply tried to obtain his "personally preferred resolution under the guise of a derivative action." The court found that there was therefore no separation between the derivative action and the redress plaintiff personally sought.

¶ 50     The court further found that plaintiff did not have standing to bring a derivative action because he was not a shareholder at the time of the alleged wrongs and had knowledge of defendant's wrongful conduct prior to becoming a shareholder. The court noted that the record showed that plaintiff obtained Luella's shares for the express purpose of trying to remove defendant from the company for his wrongful conduct. The court observed that plaintiff even attempted to remove defendant from the company before becoming a shareholder for the same reasons he raised in his complaint. The court noted that plaintiff knew the company's profit margin and seemed to have extensive knowledge of the company's operations. The court therefore concluded that plaintiff knew years before he became a shareholder about defendant's possible breaches of fiduciary duty and that he therefore did not have standing under the Act to bring a derivative action. The issue of standing is a matter of law, which is subject to *de novo* review. *Nationwide Advantage Mortgage Co. v. Ortiz*, 2012 IL App (1st) 112755, ¶ 19.

¶ 51                    1. *Standing Defenses*

¶ 52     Plaintiff first contends that the court erred in applying standing defenses in its final order when it had previously ruled in the November 2017 order that defendant had waived these defenses. Plaintiff asserts that it was unfair and prejudicial for the court to later find plaintiff lacked standing to bring a derivative action. Plaintiff maintains that there was no change in the parties'

positions between the November 2017 order and the final order that would warrant the court's modification of its standing determination. Plaintiff contends that, based on the "law of the case" doctrine, the trial court could not simply change its ruling on plaintiff's standing without a change in circumstances.

¶ 53    Plaintiff is correct that in its November 2017 order the trial court found that defendant had waived his objection to plaintiff's standing by failing to raise the objection in a timely manner. However, the November 2017 order was an order denying defendant's motion for summary judgment. Orders denying motions for summary judgment are interlocutory in nature and are not final judgments. *In re Estate of Funk*, 221 Ill. 2d 30, 85 (2006); *Ruby v. Ruby*, 2012 IL App (1st) 103210, ¶ 34. "Courts have the inherent power to review, modify, or vacate an interlocutory order at any time before final judgment." *Doe v. Department of Professional Regulation*, 341 Ill. App. 3d 1053, 1059 (2003) (citing *Catlett v. Novak*, 116 Ill. 2d 63 (1987)). There is thus no "law of the case" obstacle as plaintiff asserts.

¶ 54    Nonetheless, in its November 2017 order, the court merely found that defendant was not entitled to summary judgment on the basis of plaintiff's lack of standing. The court did not find that plaintiff had definitively proved he had standing to bring the action. Indeed, in the order, the court stated it would "permit Plaintiff *to attempt to demonstrate* that he obtained his shares in Discount Fence before Defendant's actions were disclosed to the public and before he was aware of Defendant's wrongdoing." (Emphasis added.) The court concluded that "Plaintiff *can still establish he has standing* to bring to bring the claim" under the Act. (Emphasis added.) Thus, the court did not affirmatively find that plaintiff had standing to the bring the action but permitted him an opportunity to prove that he did have standing. Ultimately, the court determined that plaintiff

did not meet this burden. We find nothing inherently erroneous about the circuit court's determination of plaintiff's standing.

¶ 55    With regard to the court's finding that defendant waived the objection to plaintiff's standing, we observe that "[s]tanding is not a procedural technicality, but rather is an aspect or component of justiciability." *Bridgestone/Firestone, Inc. v. Aldridge*, 179 Ill. 2d 141, 147 (1997) (citing *In re Estate of Wellman*, 174 Ill. 2d 335, 344 (1996)). Standing requires that a party have a real interest in the action brought and in its outcome. *Wellman*, 174 Ill. 2d at 344. "The essence of the inquiry regarding standing is whether the litigant, either in an individual or representative capacity, is entitled to have the court decide the merits of a dispute or a particular issue." *Id.* at 345. Thus, while it was proper for the court to find that defendant had waived the affirmative defense of standing by failing to raise it in a timely fashion, the court was still required to ultimately determine whether plaintiff was "entitled to have the court decide the merits" of the dispute. Here, the court determined, after considering all of the evidence presented, that plaintiff was not entitled to have the court decide the merits of the dispute and thus did not have standing. This ruling is proper given the court's responsibility to ensure the matter was justiciable, despite its earlier finding that defendant had waived its objection to plaintiff's standing. Accordingly, we find no error in the manner in which the court evaluated plaintiff's standing.

¶ 56                                    2. *Plaintiff's Personal Interest*

¶ 57    Plaintiff next contends that the court erred in finding that he lacked standing because of his personal animosity toward defendant. Plaintiff asserts that the court misapplied the relevant law and should have found that plaintiff lacked standing only if there was a conflict between his interests and Discount Fence's interests. Plaintiff maintains that the court erred as a matter of law by even considering the relationship between him and defendant. Plaintiff further contends that

the fact that he will personally recover should not have barred recovery by Discount Fence. Plaintiff asserts that the trial court could have devised a more equitable remedy limiting the financial benefit to himself, rather than denying plaintiff and Discount Fence relief altogether.

¶ 58    In finding that plaintiff lacked standing to bring a derivative action because of his personal animosity toward defendant, the trial court relied on this court's decision in *Caulfield v. The Packer Group, Inc.*, 2016 IL App (1st) 151558. In *Caulfield*, this court stated that a plaintiff in a shareholders' derivative action " 'must be qualified to serve in a fiduciary capacity as a representative of the class of stockholders, whose interest is dependent upon the representative's adequate and fair prosecution of the action.' " *Id.* ¶ 47 (quoting *Emerald Partners v. Berlin*, 564 A.2d 670, 673 (Del. Ch. 1989)). Under this standard, the court observed that a derivative plaintiff may lack standing where "there is a conflict between his interests and the interests of the parties he represents." *Id.* The court identified eight factors to consider when determining whether such conflict exists:

> "[E]conomic antagonisms between the representative and the shareholders; the remedy sought by the plaintiff in the derivative action; indications that the named plaintiff was not the driving force behind the litigation; the plaintiff's unfamiliarity with the litigation; other litigation pending between the plaintiff and the defendants; the relative magnitude of the plaintiff's personal interests as compared to his interest in the derivative action itself; the plaintiff's vindictiveness toward the defendants; and the degree of support the plaintiff was receiving from the shareholders he purported to represent." *Id.* ¶ 48.

The court noted that, while a combination of these factors could serve to disqualify a plaintiff, "a strong showing of one factor is sufficient if it shows a conflict of interest between the plaintiff and the persons he is supposed to represent fairly and adequately." *Id.*

¶ 59    Plaintiff asserts that the court improperly focused on the relationship between plaintiff and defendant rather than focusing on the relationship between plaintiff and Discount Fence, as the decision in *Caulfield* requires. However, it is clear that at least some of the factors identified by the *Caulfield* court specifically concern the relationship between the plaintiff and defendant. Particularly, the first factor, "economic antagonisms between the representative and the shareholders," and the seventh factor, "the plaintiff's vindictiveness toward the defendants," directly concern the plaintiff's personal relationship with defendant, particularly where defendant was the only other shareholder of Discount Fence. Here, it is clear, as the circuit court found, that there was "clear and pervasive animosity" between plaintiff and defendant. This animosity included both "economic antagonisms" and personal "vindictiveness."

¶ 60    The record shows that plaintiff attempted to remove defendant from Discount Fence prior to becoming a shareholder. Plaintiff acquired his shares from Luella for the express purpose of seeking redress against defendant. Plaintiff and defendant, because of their hostile relationship, were forced to separate the Discount Fence business, prompting plaintiff to start his own fencing business using Discount Fence assets. The record is thus replete with evidence of plaintiff's "economic antagonisms" and personal "vindictiveness." These factors alone are sufficient to show a conflict of interest.

¶ 61    The circuit court also focused on the second *Caulfield* factor, "the remedy sought by the plaintiff in the derivative action," and the sixth factor, "the relative magnitude of the plaintiff's personal interests as compared to his interest in the derivative action itself." The court noted that plaintiff and defendant were the only shareholders of Discount Fence and, if plaintiff were successful in ousting defendant from the company, plaintiff would be the only person who would benefit. The court determined that plaintiff was attempting to use a derivative action merely to

obtain his own personally preferred resolution. There was thus no separation between the relief sought by plaintiff personally and the relief from the derivative action. We therefore find that, under *Caulfield*, the court did not err in finding that plaintiff lacked standing to bring a derivative action because of his personal animosity toward defendant.

¶ 62                    3. *Plaintiff's Knowledge of Defendant's Conduct*

¶ 63    Plaintiff next contends that the court erred in finding that he lacked standing to bring a derivative action because he knew about defendant's wrongful conduct before he obtained his shareholder interest. Plaintiff asserts that, prior to obtaining his shares and initiating this litigation, he had only general knowledge that defendant was misappropriating corporate assets, but he did not have specific knowledge of defendant's conduct. Plaintiff contends that he attempted to obtain specific knowledge of defendant's wrongdoing but that his attempts were rebuffed by defendant's refusal to provide him any information about Discount Fence's finances. Plaintiff maintains that he knew generally defendant would take loans from Discount Fence and knew Discount Fence would pay money to SteelCo, but he did not know the specifics of those transactions or that defendant was involved in self-dealing.

¶ 64    Section 7.80(a) of the Act provides that a shareholder does not have standing to bring a derivative action unless the plaintiff was a shareholder at the time of the complained-of conduct. 805 ILCS 5/7.80(a) (West 2014). Here, the record shows, and plaintiff acknowledges, that the conduct he challenged occurred prior to the time he became a shareholder by virtue of the Share Transfer Agreement in September 2013. Section 7.80(a), however, provides an exception to this contemporaneous shareholder requirement where the plaintiff can show that he "acquired the shares before there was disclosure to the public or to the plaintiff of the wrongdoing of which plaintiff complains." *Id.* Plaintiff asserts that he satisfied this exception because, even though he

knew in general terms that defendant was misappropriating Discount Fence funds, he did not know the specific details of the intentional mismanagement of which he now complains. We find plaintiff's contentions unpersuasive.

¶ 65    As the circuit court found, plaintiff "testified that he knew, as early as 2005, [defendant] was taking loans from the company [and that] Discount Fence was paying SteelCo's rent." Plaintiff also acknowledged that he tried to obtain information from Discount Fence's accountant several times before the 2013 Share Transfer Agreement. Plaintiff knew about defendant's real estate holdings in 2001 or 2002. Crucially, plaintiff testified that he wanted to obtain Luella's shares specifically because he was concerned about defendant's misuse of Discount Fence's funds. Indeed, months before he acquired his shares from Luella, plaintiff attempted to remove defendant as president of Discount Fence for "misuse of funds" and "absenteeism." Plaintiff also gave defendant a written demand to inspect Discount Fence's books and records in which he stated that "[i]n the past" he had raised concerns with defendant regarding how Discount Fence's funds were being spent. Plaintiff testified that, by "[i]n the past," he was referring to "all the prior years" before he became a shareholder. Based on the testimony and the documentary evidence, it is clear that plaintiff knew before he became a shareholder of the wrongdoing of which he now complains.

¶ 66    Plaintiff contends, however, that this evidence shows he had only "general knowledge" of defendant's wrongdoing but did not know of the specific conduct that formed the basis of his complaint. This contention, however, is clearly belied by the record. Plaintiff was the vice president of Discount Fence. He testified he knew the company's profit margin, he knew the company's year-end financial position, and he knew about Discount Fence's payments to SteelCo. Further, he knew personal information about defendant's finances that would eventually form the basis of his claims that defendant had been misappropriating funds. Plaintiff testified that he

learned some of this information by opening mail sent to Discount Fence. Plaintiff knew about defendant's real estate holdings and investment accounts. He knew that defendant lived a lifestyle in excess of his salary from Discount Fence. Although he may not have known of the line-item transactions that were revealed during the course of the litigation, it is clear that he had sufficient knowledge of defendant's possible breaches of fiduciary duty years before he became a shareholder.

¶ 67    Nonetheless, plaintiff asserts that the trial court's ruling on this matter contradicts its ruling in the November 2017 order where it found that Luella could not have authorized defendant's specific conduct because she had only general knowledge of his wrongdoing. Plaintiff asserts that the court did not apply this same "general knowledge" standard when it evaluated plaintiff's knowledge of defendant's conduct prior to obtaining his shares. However, both plaintiff and defendant testified that Luella was not involved in Discount Fence's business and had limited, if any, knowledge of its finances. Luella herself testified that she was not involved in the management of Discount Fence and trusted defendant to run everything. Luella's limited knowledge is clearly not comparable to plaintiff's knowledge of the business as vice president, as detailed above. As such, we find that the court did not err in finding that plaintiff did not meet the exception to the contemporaneous ownership rule under section 7.80 of the Act to give him standing in this matter.

¶ 68                                B. Unclean Hands

¶ 69    Plaintiff next contends that the court erred in finding that his claims were barred under the unclean hands doctrine. Plaintiff asserts that all of the conduct the court cited in support of this finding occurred after the conduct alleged in his complaint and should not have barred his recovery as a matter of law. Plaintiff also contends that the transactions he engaged in before the case was

filed, such as taking loans from Discount Fence, were not improper and also should not have barred his recovery in this case.

¶ 70    The unclean hands doctrine precludes a party from taking advantage of his own wrong. *Long v. Kemper Life Insurance Co.*, 196 Ill. App. 3d 216, 219 (1990). "The doctrine applies if the party seeking equitable relief is guilty of misconduct, fraud or bad faith toward the party against whom relief is sought if that misconduct is connected with the transaction at issue." *Id.* Thus, the doctrine does not apply where the act giving rise to the defense does not directly involve the transaction which is the subject of the litigation. *Cole v. Guy*, 183 Ill. App. 3d 768, 776 (1989). In the context of a shareholder derivative action, however, the plaintiff may not maintain a cause of action if he has "participated or acquiesced in, or benefited from the conduct of which he now complains." *Forkin v. Cole*, 192 Ill. App. 3d 409, 425 (1989).

¶ 71    Plaintiff asserts that our review of this ruling should be *de novo* because the trial court erred as a matter of law in applying the doctrine of unclean hands. However, "[t]he application of the [unclean hands] doctrine is a matter for the trial court's discretion, which this court will not disturb on appeal absent an abuse of that discretion." *Gambino v. Boulevard Mortgage Corp.*, 398 Ill. App. 3d 21, 60 (2009) (citing *Long*, 196 Ill. App. 3d at 219). A trial court abuses its discretion when its decision is arbitrary, fanciful, or unreasonable, or where no reasonable person would take the view adopted by the court. *Palacios v. Mlot*, 2013 IL App (1st) 121416, ¶ 18 (citing *Favia v. Ford Motor Co.*, 381 Ill. App. 3d 809, 815 (2008)).

¶ 72    In this case, there was no single "transaction" at issue that gave rise to plaintiff's claims. Rather, plaintiff relied on the extensive history of defendant's misuse of Discount Fence's funds and his continued usurpation of Discount Fence's business opportunities in developing his claims. As such, in determining whether plaintiff has entered the litigation with unclean hands, the trial

court was required to examine plaintiff's use of Discount Fence's funds and his usurpation of Discount Fence's business opportunities. That is precisely what the court did in this case in determining that plaintiff's recovery was barred by the unclean hands doctrine. The court noted that plaintiff asserted that defendant enriched himself by borrowing money from Discount Fence, funneled Discount Fence funds to himself through SteelCo and Roma, and usurped Discount Fence's business opportunities. As the circuit court noted, the record shows that plaintiff also participated in and benefited from this same conduct. *Forkin*, 192 Ill. App. 3d at 425.

¶ 73    For instance, plaintiff used the Discount Fence corporate credit card to pay for vacations and did not reimburse Discount Fence for those expenses. This conduct mirrors plaintiff's contention that defendant would borrow money from Discount Fence and not repay it. Similarly, plaintiff started Fence It in Discount Fence's own building, used Discount Fence capital to fund the business, and used Discount Fence materials for the business. These actions are essentially the same as plaintiff's allegations that defendant was improperly using Discount Fence's assets to sustain SteelCo. Although, as plaintiff points out, this conduct occurred after he filed the complaint in this case, the relevant inquiry is on whether plaintiff benefited from or participated in the same conduct of which he now complains. *Id.* As noted, this is not a case where there was a single transaction to analyze but rather involved decades of transactions. The subject matter of the suit was thus defendant's continued misuse and misappropriation of Discount Fence funds. The record shows that plaintiff was involved in the same type of misconduct with regard to Discount Fence's assets. We therefore find that the trial court did not abuse its discretion in applying the doctrine of unclean hands where plaintiff participated in the same type of misuse and misappropriation of Discount Fence funds that formed the basis of his complaint. *Gambino*, 398 Ill. App. 3d at 60.

¶ 74                                    C. Damages

¶ 75    Plaintiff next contends that the court erred in finding that he failed to prove specific damages stemming from defendant's breaches of fiduciary duty. Plaintiff asserts that the court found that defendant breached his fiduciary duty by, among other things, overcharging Discount Fence for materials sold by SteelCo, using Discount Fence staff and equipment without payment, and improperly charging Discount Fence inflated rent. Plaintiff maintains that Dancu then quantified these damages in her testimony. Plaintiff asserts that the court improperly shifted the burden of accounting and that it was defendant's burden to demonstrate that the transactions Dancu identified were not improper.

¶ 76                              1. *The Trial Court's Ruling*

¶ 77    Here, as noted, the court found that defendant had breached his fiduciary duty to Discount Fence. Specifically, the court found that defendant breached his duty of loyalty when he personally acquired SteelCo without first tendering the offer to Discount Fence. The court found defendant also breached his duty of loyalty when he used Discount Fence assets to sustain SteelCo's operations and profit from SteelCo. The court further found that, through SteelCo, defendant "up-charg[ed]" Discount Fence for materials, used Discount Fence funds to pay SteelCo's rent, and used Discount Fence funds to fund a loan to Krupa, where defendant "gained $389,000 in profits from that loan." The court determined that defendant up-charged Discount Fence for SteelCo's materials because he sold the inventory to Discount Fence based on the market rate for steel, rather than for an at-cost amount. The court noted that this pricing scheme indicated that defendant intended to use SteelCo to turn a profit, given that SteelCo no longer manufactured any materials but instead merely supplied Discount Fence with previously manufactured materials. The court stated that, instead of purchasing SteelCo personally and selling materials to Discount Fence for a profit, defendant should have offered Discount Fence the opportunity to purchase SteelCo and

thereby acquire its entire inventory. The court observed that, although defendant did not take a salary or dividend from SteelCo, he used SteelCo funds to make personal loans to himself. The court found that these loans represented personal profit because defendant would use the loans for investments in real estate and brokerage accounts.

¶ 78    The court further found that defendant breached his fiduciary duty to Discount Fence by using Discount Fence funds to pay a portion or all of SteelCo's rent on the warehouse without a lease or loan documentation. The court found that, because of the lack of documentation, there was no evidence suggesting that Discount Fence's rent payments were proportional or fair. For similar reasons, the court found that defendant breached his fiduciary duty to Discount Fence by using Discount Fence assets in his operation of Roma. The court found that defendant personally purchased Roma rather than tendering the opportunity to Discount Fence and funneled Discount Fence funds through Roma in order to make a loan to himself.

¶ 79    Despite finding that plaintiff had proved defendant's breaches of fiduciary duty by usurping corporate opportunities with SteelCo and Roma, the court found that plaintiff "failed to present clear and convincing evidence [defendant's] breach caused damages to Discount Fence." The court determined that plaintiff did not present specific testimony on the amount of monetary damage the breaches caused to Discount Fence or on the amount that defendant improperly collected as a result of his purchases of SteelCo and Roma. The court noted that it suspended the trial for a nearly a year to give plaintiff and Dancu an opportunity to evaluate the records, but plaintiff nonetheless failed to present specific testimony about the financial impact that the lost corporate opportunities had on Discount Fence. The court noted that plaintiff and Dancu had access to all of Discount Fence's financial information but that Dancu did not present specific financial analysis that explained how Discount Fence lost profits or incurred other damages as a result of

defendant's actions with SteelCo or Roma. The court observed that Dancu merely identified several transactions that "raised questions" but did not present a detailed analysis about the financial impact that those actions had on Discount Fence. Specifically, the court noted there was no testimony regarding the cost of steel and the mark-up that SteelCo charged to Discount Fence for materials or analysis about the profits Discount Fence would have made, had it acquired SteelCo itself. The court therefore found that there was "no concrete testimony about the direct damages Discount Fence incurred as a result of [defendant's] actions with respect to SteelCo and Roma."

¶ 80                                2. *Standard of Review*

¶ 81      Initially, we observe that the parties disagree as to the standard of review on this issue. Plaintiff contends that, because the trial court's errors involve the application of the law and errors in evaluating undisputed facts, our standard of review should be *de novo*. It is well settled, however, that "[t]he assessment of damages by a trial court sitting without a jury will not be set aside unless it is manifestly erroneous." *Dowd & Dowd, Ltd. v. Gleason*, 352 Ill. App. 3d 365, 385 (2004) (citing *Vendo Co. v. Stoner*, 58 Ill. 2d 289, 311 (1974)). A ruling is manifestly erroneous only "if it contains error that is clearly evident, plain, and indisputable." (Internal quotation marks omitted.) *People ex rel. Madigan v. J.T. Einoder, Inc.*, 2015 IL 117193, ¶ 40. Plaintiff maintains, however, that we should nevertheless reverse the circuit court's ruling even under this more deferential standard of review.

¶ 82             3. *Plaintiff Failed to Present Specific Evidence of Damages*

¶ 83      In an action for breach of fiduciary duty, the party seeking damages must supply a reasonable basis for the computation of those damages. *Levy v. Markal Sales Corp.*, 268 Ill. App. 3d 355, 372 (1994) (citing *Ashe v. Sunshine Broadcasting Corp.*, 90 Ill. App. 3d 97, 101 (1980)).

A plaintiff must present proof of lost profits from which a reasonable basis of computation can be derived. *Dowd*, 352 Ill. App. 3d at 387. Further, the plaintiff must show with a reasonable degree of certainty that defendant's breach caused a specific portion of lost profits. *Id.*

¶ 84    Plaintiff here asserts that Dancu's testimony was sufficient to show his and Discount Fence's "specific damages." Plaintiff contends that Dancu testified that Discount Fence paid SteelCo $1,032,184 from 1999 through June 2013. Dancu testified that some of these payments were for rent and materials but that some of the payments she could not trace to a specific transaction. She noted that there was an unknown portion of $304,300 that she could not identify, which stemmed from three separate transactions. Dancu testified that on occasion Discount Fence would pay rent on SteelCo's behalf directly to the owner of the warehouse where SteelCo and Discount Fence both stored materials. She noted that this amount of rent was usually higher than the amount SteelCo would pay in rent, but she did not perform an evaluation of the fair market value of the leased property.

¶ 85    Dancu also noted that SteelCo's tax returns often showed a different amount of gross receipts than the amount of deposits. Dancu concluded that this indicated that were deposits that went through SteelCo's checking account, that did not match SteelCo's tax returns. Dancu noted that there were other transactions that raised questions, such as defendant's repayment of loans to Discount Fence and defendant's use of the Discount Fence corporate line of credit. Although Dancu concluded that defendant's lifestyle exceeded his income, she acknowledged that she did not review his tax returns from prior to 2008.

¶ 86    Despite plaintiff's contentions to the contrary, Dancu's testimony did not provide specific evidence of plaintiff's damages. Nor did the documentary evidence, standing alone or in conjunction with Dancu's testimony, constitute such evidence. As discussed further below, despite

defendant's unwillingness to comply with discovery orders throughout the litigation, defendant eventually did produce the requested financial documentation, including the uncondensed QuickBooks file. Plaintiff thus had tax returns, check registers, and QuickBooks files detailing transactions, among other documents. Plaintiff then, through Dancu's testimony, identified questionable transactions and drew comparisons across documents and companies demonstrating where funds may have been misappropriated or misused. What plaintiff failed to do, however, was to reconcile all of these transactions, documents, loans, and payments and to quantify his damages using additional evidence, such as the fair market value of the rent of the warehouse or the Downers Grove property or the cost of steel.

¶ 87    Plaintiff's failure to present evidence of specific damages was an issue the court addressed at trial during Dancu's testimony. Prior to suspending the trial, the trial court addressed the parties, stating that plaintiff needed to provide evidence showing how much defendant's actions had damaged Discount Fence. The court stated that plaintiff could call an expert, such as Dancu, to "say [due to the alleged misappropriation of funds that] the company should have another million bucks here or whatever over the years, over the last 20 years or whatever." The court noted that plaintiff had not presented testimony that, "if all of this transaction [*sic*] had not taken place, the company today would have another million bucks; there is nobody to say that." Plaintiff failed to remedy this issue once trial resumed. Again, Dancu identified transactions she deemed questionable, noted payments that did not appear to correlate across companies, and called into question defendant's sources of income, but she did not specifically identify Discount Fence's lost profits as a result of defendant's breaches of fiduciary duty. Nor did she provide the court with a final accounting showing the amount of Discount Fence's damages from all of the questionable transactions she identified. In short, despite Dancu's access to all of Discount Fence's financial

records, including the uncondensed QuickBooks file and financial documentation from SteelCo

and Roma, she was unable to identify any lost profits or other damages stemming from defendant's

breach of fiduciary duty.[3] As the trial court concluded: "There was no analysis about the cost of

steel and the mark-up SteelCo charged Discount Fence for inventory. There was no analysis about

the profits Discount Fence could have made or saved if it had been able to directly acquire SteelCo

itself." There was no evidence of the fair market value of the warehouse or what damages Discount

Fence incurred in either paying more than its proportionate share of the rent or in paying rent

directly to the leaseholder on SteelCo's behalf.[4] There was no evidence that defendant's personal

loans from the company resulted in any lost profits or opportunities or that the loans were never

repaid. Despite plaintiff's assertion that these loans were largely interest free, plaintiff failed to

---

[3]Plaintiff asserts that Dancu was unable to perform a full accounting because defendant withheld documents, but plaintiff's assertion is belied by the record. Prior to suspending the trial, the court asked Dancu if she would be able to list all of the documents she needed to perform a "full accounting." Dancu said she would need Discount Fence's uncondensed QuickBooks file. The trial resumed nearly a year later after Dancu had adequate time to review the uncondensed QuickBooks file. Throughout the trial, the court commented on additional evidence plaintiff could have sought from defendant. For instance, during defendant's testimony, the court asked plaintiff's counsel if he needed access to SteelCo's QuickBooks file. Plaintiff's counsel replied that he did not subpoena SteelCo but that plaintiff had its tax returns and check register. Plaintiff's counsel informed the court that, "that's all, frankly, Judge, I need." Thus, despite the protracted discovery, there is no suggestion after trial started and after the court ordered defendant to produce Discount Fence's uncondensed QuickBooks file that Dancu or plaintiff needed additional documentation to perform a "full accounting."

[4]Although the trial court did not find defendant breached his fiduciary duty with regard to leasing the Downers Grove property to Discount Fence, Dancu's testimony on this subject and plaintiff's contentions both before this court and at trial illustrate the deficiencies in his case. Dancu testified that, from 2004 through 2013, Discount Fence paid defendant "additional rent" of $73,000 on the Downer's Grove property. Plaintiff routinely points to this "additional rent" as further evidence of defendant's misappropriation of Discount Fence's funds. However, defendant testified at trial that, during years when Discount Fence was earning less money, he would charge Discount Fence less rent. During years that Discount Fence was earning more money, it would make up for those lower payments by paying "additional rent." Although the trial court was not required to take defendant's testimony on this matter at face value, plaintiff failed to show that by paying this "additional rent," Discount Fence paid more than the fair market value for the property from 2004 through 2013. This is the same sort of deficiency the court found with regard to plaintiff's other claims.

present evidence as to what the interest rate on the loans should have been and how much total interest defendant would have owed to Discount Fence if it collected interest on his loans.

¶ 88    We find this court's ruling in *Dowd* illustrative. In that case, Dowd & Dowd Ltd. (Dowd), a law firm, was retained by a subsidiary of Allstate Insurance Company (AllState) to advise the company on insurance coverage of claims arising for injuries from exposure to asbestos. *Id.* at 369. Dowd attorney Nancy Gleason managed the Allstate account. *Id.* Gleason and another Dowd attorney, Douglas Shreffler, resigned as shareholders (partners) of Dowd and opened a new law firm, Gleason, McGuire and Shreffler (GMS). *Id.* Allstate moved its business to GMS. *Id.* Dowd filed suit against Gleason and Shreffler, alleging, *inter alia*, breach of fiduciary duty. *Id.* at 370. At trial, Dowd presented the expert testimony of Todd Lundy, a certified public accountant. *Id.* at 384. Lundy testified that he reviewed "various financial documents from Dowd (such as paid bills, records of invoice collections) and some tax returns of GMS." *Id.* He divided his opinions into three categories: compensation and bonus-related damages, out-of-pocket damages, and lost profit. *Id.*

> "Lundy testified that it was his opinion that the total damages incurred in this case
> amounted to $2,591,605.54. Lundy determined that the compensation and bonus-related
> monies issued to Nancy Gleason, Maureen Gleason, Douglas Shreffler and Judith Gleason
> totaled $440,274. The lost profits totaled $871,199.75. Lundy testified that he used a two-
> year period for the lost profits because of the manner in which law firms perform their
> accounting and because the information provided to Harris Bank by defendants for GMS's
> line of credit included a two-year projection. Lundy's calculations also included, but are
> not limited to, the following: Gleason and Shreffler's salaries for the period August 7, 1990,
> to December 31, 1990, totaling $110,999.89; a $9,719.81 construction expense in Dowd's

sublease; $5,817.35 for the reinsurance conference held in Bermuda in November 1990 attended by, among others, Virginia Vermillion, Nancy Gleason, and Allstate's Riley; $5,624 Allstate lawyers' section Christmas party; total compensation, bonus-related and out-of-pocket damages in the amount of $849,206.04; and $871,199.75 in lost profit damages for years' end December 31, 1991, and December 31, 1992." *Id.* at 384-85.

The circuit court found that the total amount of damages from the defendants' breach was $2,464,889.46, which it based on Lundy's testimony with certain deductions. *Id.* at 385. This court affirmed that amount on appeal, finding that the plaintiffs had adequately proved the amount of damages based on "the detailed testimony and exhibits provided by" Lundy. *Id.* at 385-87.

¶ 89    This detailed testimony and exhibits of the amount of damages presented by Dowd's expert are precisely what the trial court found absent from Dancu's testimony. In *Dowd*, Lundy testified to specific amounts of damages and categorized and, more importantly, calculated those amounts. The *Dowd* court repeatedly noted that Lundy had calculated the amount of damages to "a reasonable degree of certainty." *Id.* at 386-87. Here, although Dancu provided competent testimony, she merely identified questionable transactions and pointed out where certain amounts did not align across documents and companies, but she did not offer an opinion of either lost profits, lost interest, or even a summary conclusion of total damages. The detailed testimony provided by Lundy in *Dowd* is precisely the type of testimony the trial court told plaintiff's counsel it needed before suspending the trial. Plaintiff failed to present such evidence, and accordingly, we find that the trial court's ruling that plaintiff failed to provide specific evidence of damages was not manifestly erroneous.

¶ 90                            D. Accounting

¶ 91    Finally, plaintiff contends that the court erred in finding that he was not entitled to an equitable accounting based on defendant's breach of fiduciary duty. Plaintiff asserts that the court's ruling, finding that his accounting claim was moot because defendant had already produced the uncondensed QuickBooks file, conflicted with the court's November 2017 order and improperly shifted the burden of proof. Plaintiff asserts that there were numerous unexplained transactions that plaintiff illuminated at trial and it was defendant's burden, once plaintiff established breach of fiduciary duty, to show that the transactions comported with his fiduciary duty.

¶ 92                            1. *Equitable Accounting*

¶ 93    An accounting is a statement of receipts and disbursements to and from a particular source. *Devyn Corp. v. City of Bloomington*, 2015 IL App (4th) 140819, ¶ 71. "The right to an accounting is not an absolute right, but one which should be accorded only on equitable principles." *Tarin v. Pellonari*, 253 Ill. App. 3d 542, 555 (1993). Because the need for an accounting is dependent on the particular facts of each case, there are no guidelines for determining when an accounting is warranted. *Id.* To state a cause of action for an accounting, "the complaint must establish that there is no adequate remedy at law and one of the following: (1) a breach of a fiduciary relationship between the parties; (2) a need for discovery; (3) fraud; or (4) the existence of mutual accounts which are of a complex nature." (Internal quotation marks omitted.) *Landers v. Fronczek*, 177 Ill. App. 3d 240, 245 (1988). A trial court will not order an equitable accounting where doing so would be unnecessary. *Devyn Corp.*, 2015 IL App (4th) 140819, ¶ 71; see *Tarin*, 253 Ill. App. 3d at 555 ("[I]t is axiomatic that an accounting will not be ordered if the circumstances are such as to make it unnecessary or improper."). The plaintiff bears the burden of establishing that he has the right to an accounting. *Tarin*, 253 Ill. App. 3d at 555.

¶ 94    Plaintiff asserts that the trial court's decision to not order an accounting is an issue of law, which this court should review *de novo*. As noted, however, whether to grant an accounting is a matter of the trial court's discretion. *Newton v. Aitken,* 260 Ill. App. 3d 717, 722 (1994). In reviewing a trial court's decision to not grant an equitable accounting, this court has applied both an abuse of discretion standard and a manifest weight of the evidence standard. *Tarin*, 253 Ill. App. 3d at 555-56 (citing *Ferrell v. Plasti-Drum Corp.*, 159 Ill. App. 3d 936, 940 (1987), and *Ferrara v. Collins*, 119 Ill. App. 3d 819, 822 (1983)). Although it is unclear which of these deferential standards applies, as in *Tarrin*, it is unnecessary for us to resolve this matter because we find that the trial court's ruling was correct under either standard. *Id.* at 556.

¶ 95                                  2. *Trial Court Ruling*

¶ 96    In addressing plaintiff's claim for an equitable accounting, the trial court first noted that plaintiff was not entitled to an accounting because it had already found that he did not have standing under the Act to bring a derivative action. The court nevertheless found that, notwithstanding his lack of standing, plaintiff had failed to prove a need for an accounting. The court observed that plaintiff had access to Discount Fence's uncondensed QuickBooks file and Dancu had a year to review and analyze the transactions in that file. The court noted that, despite this extensive period of review, Dancu did not demonstrate that Discount Fence had lost profits as a result of defendant's breach of fiduciary duty. As with plaintiff's damages claim, the court found that Dancu failed to do any analysis of profits gained by defendant or lost by Discount Fence because of defendant's misappropriation of funds or usurpation of business opportunities. Accordingly, the court found that plaintiff's claim for an accounting was moot because he had access to all of the QuickBooks files and failed to show that defendant owed Discount Fence profits for which he should account.

¶ 97                              3. *An Accounting Was Unnecessary*

¶ 98     As the trial court noted, plaintiff's claim for an equitable accounting could be resolved solely on the basis of his lack of standing to bring a derivative action under the Act. As the trial court found, however, even if plaintiff had standing to maintain this derivative action, we would nonetheless find that he had failed to show that he was entitled to an equitable accounting. First, as discussed above, the trial court's comments that plaintiff had stated a cause of action for an accounting in its November 2017 order are immaterial to its final disposition. In that order, the court found that plaintiff's claim for an accounting was not moot because plaintiff's breach of fiduciary duty claim was premised on the notion that Discount Fence had been damaged in an amount that could not be determined without an accounting. The crux of the trial court's decision in the final order was that, during the course of the litigation, plaintiff had obtained all of the documentation he would have obtained through an accounting but nonetheless failed to definitely show lost profits or other damages. As discussed above, plaintiff had access through discovery to tax returns, check registers, and Discount Fence's Quickbooks file, among other financial documentation. These are precisely the documents plaintiff would seek in an accounting.

¶ 99     Plaintiff contends, however, that defendant failed to produce documentation that was necessary for a full accounting. Plaintiff specifically identifies the price list SteelCo used to charge Discount Fence for materials, invoices from SteelCo to Discount Fence, checks from Discount Fence to SteelCo reflecting payments from Discount Fence to SteelCo, and "evidence of where the missing $300,000 Discount Fence paid to SteelCo but which never made it to SteelCo's account went." With regard to plaintiff's request for documentation from SteelCo, we note that this issue was addressed at trial. As discussed, *supra*, ¶ 87 n.3, the court asked plaintiff's counsel if he needed further documentation from SteelCo, and plaintiff's counsel responded that SteelCo's tax returns

and check register was all that he needed. "[W]hen plaintiff initiated its lawsuit, it had the right through discovery to obtain all the information which would be contained in an equitable accounting. Pursuant to Illinois Supreme Court Rule 214 ***, plaintiff had the right to request the production of financial documents related to the District's fund." *Devyn*, 2015 IL App (4th) 140819, ¶ 78. Plaintiff thus had the right to request these materials from SteelCo but chose not to do so even after the court specifically asked plaintiff if he required additional documentation from SteelCo. Further, invoices from SteelCo to Discount Fence and checks from Discount Fence to SteelCo would be reflected in Discount Fence's QuickBooks file. Moreover, SteelCo's financial information is irrelevant to plaintiff's accounting claim. In his complaint, plaintiff sought an accounting of "Defendant's transactions and *Discount Fences'* [sic] books, records, files, and calendars" to determine his damages. (Emphasis added.)

¶ 100   With regard to Discount Fence's "books, records, [and] files," we observe, as the trial court noted, that all of Discount Fence's transactions were included in the uncondensed QuickBooks file or reflected on its tax returns. Through discovery, plaintiff thus had access to information concerning Discount Fence's payments to SteelCo; information regarding defendant's officer loans; and tax returns for SteelCo, Discount Fence, defendant, and Roma. Thus, defendant had already tendered all financial information relating to Discount Fence when it turned its discovery material over to plaintiff. *Id.* ¶ 79. As such, an equitable accounting would provide no more information than that which was already contained in the QuickBooks file and other documentation plaintiff already obtained through discovery. *Id.*

¶ 101   Finally, plaintiff's contention that the court improperly shifted the burden of proof is unfounded. The burden of proof in an accounting action is on the party that seeks the remedy. *Ferrell*, 159 Ill. App. 3d at 940. As such, plaintiff had "the burden of proving by a preponderance

of the evidence a right to the accounting." *Id.* Plaintiff asserts that he was entitled to an accounting based on defendant's breach of fiduciary duty. However, as noted, "[t]he right to an accounting *** is not an absolute right, but is one which should be accorded only on equitable principles. It will not be ordered if the circumstances are such as to make an accounting unnecessary or improper." (Internal quotation marks omitted.) *Netisingha v. End of the Line, Inc.*, 107 Ill. App. 3d 275, 278 (1982). Here, the circuit court found that an accounting was unnecessary given plaintiff's access to Discount Fence's financial information through discovery. We cannot say that such a decision was an abuse of discretion or against the manifest weight of the evidence. Accordingly, we affirm the trial court's judgment finding that plaintiff was not entitled to an accounting.

¶ 102                                        E. Cross-Appeal

¶ 103   As noted, defendant raises two contentions on cross-appeal that he contends were raised at trial but not addressed in the circuit court's final order. Defendant asserts that he filed his cross-appeal solely to preserve the two additional arguments "which may provide additional grounds for affirmance." Because we affirm the trial court's order in all respects, we find it unnecessary to address the contentions raised on cross-appeal.

¶ 104                                        III. CONCLUSION

¶ 105   For the reasons stated, we affirm the judgment of the circuit court of Cook County.

¶ 106   Affirmed.

**No. 1-19-2521**

| | |
|---|---|
| **Cite as:** | *Tufo v. Tufo*, 2021 IL App (1st) 192521 |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 14-CH-000783; the Hon. Moshe Jacobius, Judge, presiding. |
| **Attorneys for Appellant:** | William P. Suriano, of Riverside, for appellant. |
| **Attorneys for Appellee:** | Patrick J. Keating, of Keating Law LLC, of Homewood, for appellee. |